CONSERVATION COMMISSION OF THE TOWN OF
SIMSBURY *v*. EDMUND W. PRICE ET AL.
(11769)

PETERS, HEALEY, PARSKEY, SHEA and GRILLO, Js.

Argued February 9—decision released June 19, 1984

*Edmund W. Price,* pro se, with whom, on the brief, was *Ruth D. Price,* pro se, the appellants-appellees (defendants).

*Marshall K. Berger, Jr.,* with whom, on the brief, was *Timothy H. Everett,* law student intern, for the appellee-appellant (plaintiff).

ARTHUR H. HEALEY, J. The plaintiff, the Simsbury conservation commission (commission), brought this action seeking to enjoin the defendants from continuing to conduct an activity on the defendants' property in violation of the Inland Wetlands and Watercourses

Act; General Statutes §§ 22a-36 through 22a-45; and other relief.[1] After a hearing concerning the plaintiff's motion for a temporary injunction only, the court, in a memorandum of decision and judgment dated April 10, 1981, granted the temporary injunctive relief requested. Subsequently, after a trial relating to the plaintiff's remaining claims, the court "permanently enjoined [the defendants] from conducting any regulated activity in a wetland or watercourse on their residential property . . ." and awarded attorney's fees in the sum of $2500.

On this appeal, the defendants claim: (1) that the plaintiff should not have prevailed in its request for injunctive relief because it acted in bad faith and "came into court with unclean hands"; (2) that their activities on their property fall within the statutory exceptions to the act; (3) that the trial court's findings of fact concerning downstream siltation were not supported by the evidence and, therefore, the court should not have issued a permanent injunction in the absence of a showing of present harm; and (4) that the trial court erred in denying the defendants' motion to file a counterclaim for alleged violations of their rights under the fifth and fourteenth amendments to the United States constitution. We find no error.[2]

The following salient facts are without dispute. The defendants are owners of a residential property on the easterly side of Woodchuck Hill Road in Simsbury. On their property is a house which is built on a fairly steep slope. At the bottom of this slope is a small stream

[1] The plaintiff's prayer for relief also included requests for damages of $1000 per day, and attorneys' fees, costs and expenses under General Statutes § 22a-44; an order requiring the defendants to comply with all applicable statutes and regulations; and any other relief which the court deemed proper.

[2] The plaintiff has filed a cross appeal, and a counterstatement of issues which raise essentially the same questions of law raised by the defendants' appeal. No briefs have been filed by any party on the cross appeal.

beyond which the land rises sharply to Woodchuck Hill Road. In 1968, the defendants constructed a dam at the northerly part of their property to pond the stream. The dam consists of reinforced concrete in the center and dirt on its sides or wings. A small pipe protrudes from the northerly side of the dam which emits an odor of sewage. When operative, the dam creates a pond which is approximately thirty-five feet across and the dam is high enough to hold back water to a level of about four feet above the stream bed. The top of the dam on its northerly or downstream face is about ten feet above the bottom of the stream bed. The dam is equipped with a device which can be used to lower the water level of the pond.

On July 12, 1977, the defendant Ruth Price filed an incomplete application for a permit from the commission to carry on a proposed regulated activity under the Simsbury inland wetlands and watercourses regulations. The application stated that the purpose of the proposed activity was to "restore pond by refurbishing spillway and dam." As of this time there was a large V-shaped "break" in the dam in its westerly earthen part. In August, 1977, the commission wrote to the defendants requesting additional information regarding their application for a permit to restore the dam. In the early part of December, 1977, the commission again wrote to Ruth Price to confirm their agreement that she would provide it with certain information concerning the elevation of the dam spillway and their driveway culvert, as well as an engineer's certification of the concrete spillway and earth embankments. This information was never provided to the commission. In excess of one year later, in the latter part of December, 1978, the commission returned the ten dollar application fee which Ruth Price had paid with her applica-

tion and informed her that her application had been deemed incomplete. The parties have stipulated that no permit was ever issued.

The large V-shaped break in the dam's westerly earthen part continued to exist through the summer of 1980. At that time, the defendant Edmund Price filled in the V-shaped break and later that same year he applied concrete by trowel on both dirt wings of the dam. The parties stipulated that "there was essentially no water in the pond area from at least July 12, 1977, through the summer of 1980" and that "[b]y November 5, 1980 the dam had been repaired and [held] back water altering the existing watercourse." About this time, the defendants' actions with respect to the dam again came to the attention of the commission. On November 7, 1980, the commission, through the town conservation officer, prepared a cease and desist order dated November 8, 1980. This order stated that the defendants' activities concerning the dam on their premises were being conducted in a watercourse for which a permit was required under the Simsbury regulations. Therefore, the commission "ordered [them] to cease immediately any work on the project." The order informed the defendants that a hearing would be held on November 18, 1980, to provide them with an opportunity to show cause as to why the order should not remain in effect. On November 7, 1980, this order was delivered to the sheriff to be served upon the defendants on November 8, 1980. The sheriff served the order on the evening of November 7, 1980, without any attestation.

Subsequently, having found that he had mistakenly delivered the order one day early, the sheriff returned to the defendants' home on November 8, 1980, read the order to Edmund Price, attested the order, and "delivered" it to Edmund Price. The hearing provided for in the order was scheduled to occur on November

18, 1980, which was within ten days of the November 8, 1980 date of the order, but not within ten days of November 7, 1980. The defendants did not appear at that hearing although they actually knew it would be held on November 18, 1980, and, therefore, the commission referred the matter to legal counsel for further proceedings which resulted in this action.

In initially granting the plaintiff's request for a temporary injunction, the court found that the defendants had "conducted a regulated activity in a wetland and in a watercourse without a permit in violation of the 'Inland Wetlands and Watercourses Regulations of the Town of Simsbury' § 4." After a trial concerning the plaintiff's claims for a permanent injunction and attorneys' fees, the court specifically concluded that the "[d]efendants' actions in filling the V-shaped hole in the bank in the late summer of 1980 and applying concrete to the area in late 1980 were the conduct of regulated activities in a regulated area of the town. The defendants' activities altered the watercourse located on their property." The court further concluded that the "[d]efendants' actions included removal or deposition of significant amounts of material from or onto a watercourse and the diversion of a watercourse" and that their actions did not fall under any of the act's exceptions.

I

The defendants' first claim concerns the circumstances surrounding the plaintiff's issuance of a cease and desist order in November, 1980. The defendants maintain that the order was "defective" since it did not meet the requirements of General Statutes § 22a-44 (a),[3] and that

[3] General Statutes § 22a-44 (a) provides in part: "If the inland wetlands agency or its duly authorized agent finds that any person is conducting or maintaining any activity, facility or condition which is in violation of sections 22a-36 to 22a-45, inclusive, or of the regulations of the inland wetlands agency, the agency or its duly authorized agent may issue a written

the plaintiff acted in bad faith when it chose to go forward with a hearing on its motion for a temporary injunction which, the defendants assert, the court granted in reliance upon the facts which the order purported to represent. We find no merit to this claim.

The record does not in any way indicate any bad faith on the part of the plaintiff, and the trial court, after a hearing on the temporary injunction and a full trial on the permanent injunction, made no indication in its memoranda of any bad faith or improper conduct on the part of the plaintiff which would rise to the level of "unclean hands." There is no dispute that the defendants had actual notice of the scheduled hearing relating to the cease and desist order, and the trial court so found.

The trial court noted in its memorandum of decision on the permanent injunction that the "[f]ailure to issue the statutory order under [General Statutes] § 22a-44 (a), would be fatal to [the] plaintiff's cause of action under that section because the purpose of the order is notice." The trial court found that "[t]he notice was 'issued' on November 7, 1980," but that the hearing was not held within ten days of that date as required under General Statutes § 22a-44 (a) since it was held on November 18, 1980. The trial court, however, granted the injunctive relief requested by the plaintiff under General Statutes § 22a-44 (b) which provides in part: "The superior court, in an action brought by the commissioner, municipality, district or any person, shall have jurisdiction to restrain a continuing violation of said sections, to issue orders directing that the violation be corrected or removed and to impose fines pur-

---

order by certified mail, to such person conducting such activity or maintaining such facility or condition to cease immediately such activity or to correct such facility or condition. Within ten days of the issuance of such order the agency shall hold a hearing to provide the person an opportunity to be heard and show cause why the order should not remain in effect."

suant to this section." This statute provided the plaintiff with an alternative statutory remedy to that contained in § 22a-44 (a) of the act and quite clearly the trial court's finding relating to the plaintiff's failure to comply with § 22a-44 (a) in no way affects the viability of the plaintiff's action which was instituted under General Statutes §§ 22a-36 through 22a-45.[4] Because of the posture of this case on appeal, the validity of the reissuance of the cease and desist order is not properly before us.

## II

We next turn to the defendants' claim that their activities fall within the exceptions to the act, and therefore, that they are not required to have a permit to engage in such activities.

The town of Simsbury, under the authority of § 22a-42 of the act,[5] has promulgated regulations con-

---

[4] We note that the defendants claim in their reply brief that the trial court permitted the plaintiff to amend its complaint on the day before the trial was concluded to allege a cause of action under § 22a-44 (b) and that the plaintiff, until that time, had brought its action under § 22a-44 (a). This claim is without merit not only because the plaintiff's action was brought under General Statutes §§ 22a-36 through 22a-45, but also because this issue was never raised by the defendants at the trial. Practice Book § 3063; *Chaplin* v. *Balkus,* 189 Conn. 445, 447, 456 A.2d 286 (1983).

This court has always been solicitous of the rights of pro se litigants and, like the trial court, will endeavor to see that such a litigant shall have the opportunity to have his case fully and fairly heard so far as such latitude is consistent with the just rights of any adverse party. *Connecticut Light & Power Co.* v. *Kluczinsky,* 171 Conn. 516, 519–20, 370 A.2d 1306 (1976); *Bitonti* v. *Tucker,* 162 Conn. 626, 627, 295 A.2d 545, cert. denied, 409 U.S. 851, 93 S. Ct. 62, 34 L. Ed. 2d 94 (1972).

We do note that the defendant Edmund Price appeared pro se in this appeal although he was represented by counsel in the trial court. We also note that at the trial he testified that he held a law degree from Columbia Law School.

[5] General Statutes § 22a-42 (a) provides: "To carry out and effectuate the purposes and policies of [the act] it is hereby declared to be the public policy of the state to encourage municipal participation by means of regulation of activities affecting the wetlands and watercourses within [their]

cerning activities on inland wetland and watercourses within the town. Under § 4.1 of its regulations, the town requires that "[n]o person shall henceforth conduct a regulated activity in a regulated area of the Town of Simsbury without first obtaining a permit from the Simsbury Conservation Commission." Under the town's regulations, a "regulated activity" is defined as "any permanent or temporary operation within or use of a wetland or watercourse involving removal or deposition of material or any obstruction, construction in, alteration or pollution of such wetland or watercourse, but shall not include the uses in Section 3 of these Regulations."[6] Section 3 of the town's regulations, which sets forth the uses "permitted in inland wetlands and watercourses as of right," tracks the language of General Statutes § 22a-40[7] for all purposes

territorial limits . . . ." General Statutes § 22a-42 (c) provides in pertinent part: "Any municipality, acting through its legislative body, may authorize any board or commission, as may be made by law authorized to act, or may establish a new board or commission to promulgate such regulations, in conformity with the regulations promulgated by the commissioner [of environmental protection] . . . as are necessary to protect the wetlands and watercourses within its territorial limits."

[6] General Statutes § 22a-38 (13) similarly provides: " 'Regulated activity' means any operation within or use of a wetland or watercourse involving removal or deposition of material, or any obstruction, construction, alteration or pollution, of such wetlands or watercourses, but shall not include the specified activities in section 22a-40 . . . ."

[7] General Statutes § 22a-40 provides: "PERMITTED OPERATIONS AND USES. (a) The following operations and uses shall be permitted in wetlands and watercourses, as of right: . . .

"(4) Uses incidental for the enjoyment and maintenance of residential property, such property defined as equal to or smaller than the largest minimum residential lot site permitted anywhere in the municipality, provided in any town, where there are no zoning regulations establishing minimum residential lot sites, the largest minimum lot site shall be two acres. Such incidental uses shall include maintenance of existing structures and landscaping but shall not include removal or deposition of significant amounts of material from or onto a wetland or watercourse or diversion or alteration of a watercourse; and . . .

"(b) The following operations and uses shall be permitted, as nonregulated uses in wetlands and watercourses, provided they do not disturb the

relevant to this case, and it is under that statutory provision which the defendants claim their exemption from the requirement that they receive a permit. Specifically, they point to the exception to "regulated activities" found in the act at § 22a-40 (a) (4) and claim that their activities with respect to their dam as set forth above constituted a use that was "incidental for the enjoyment and maintenance" of their property and in the nature of maintenance of an existing structure.[8] Moreover, they claim that between 1968 and 1977 they stocked their pond with fish and, therefore, their activities fall within the exception found in General Statutes § 22a-40 (b) (1).

In considering the exceptions claimed by the defendants, the trial court concluded that the "erection of the dam is not a use 'incidental for the enjoyment and maintenance of residential property' " and that the "[d]efendants' actions included removal or deposition of significant amounts of material from or onto a watercourse and the diversion of a watercourse." The court further concluded that the "[d]efendants' actions also disturbed the watercourse and did nothing for conservation."

The general principle that statutory terms are to be given meanings according to their commonly approved usage of language is clearly applicable to the provisions upon which the defendants rely. See *Aaron* v. *Conservation Commission*, 183 Conn. 532, 548, 441 A.2d 30 (1981); see generally *Connecticut Light & Power Co.* v. *Costle*, 179 Conn. 415, 423, 426 A.2d 1324 (1980); *International Business Machines Corporation* v.

---

natural and indigenous character of the wetland or watercourse by removal or deposition of material, alteration or obstruction of water flow or pollution of the wetland or watercourse:

"(1) Conservation of soil, vegetation, water, fish, shellfish and wildlife . . . ."

[8] The dam was initially constructed in 1968, several years prior to the enactment of the act and the Simsbury regulations promulgated thereunder.

*Brown,* 167 Conn. 123, 134, 355 A.2d 236 (1974). Further, we point out that exemptions to statutes are to be strictly construed; *Aaron* v. *Conservation Commission,* supra, 549, citing *Kulis* v. *Moll,* 172 Conn. 104, 110, 374 A.2d 133 (1976); and that those who claim the benefit of an exception under a statute have the burden of proving that they come within the limited class for whose benefit it was established. *Aaron* v. *Conservation Commission,* supra, citing *Goodwin* v. *Giovenelli,* 117 Conn. 103, 107, 167 A. 87 (1933).

It is disputed that the defendants' conduct in what they claim is "repair" to their dam constituted "maintenance" within the language and intent of § 22a-40 (a) (4). Concerning the defendants' claim of exemption under § 22a-40 (a) (4), we emphasize that this provision, while it exempts from "regulated activities" for which a permit is required under the town's regulations uses which are "incidental for the enjoyment and maintenance of residential property . . . includ[ing] maintenance of existing structures . . . ," contains the express limitation that such uses "shall not include removal or deposition of significant amounts of material from or onto a wetland or watercourse *or diversion or alteration of a watercourse* . . . ." (Emphasis added.) We first point out that the trial court found that the defendants' activities "altered the watercourse located on their property" and its memorandum of decision on the permanent injunction states that the defendants stipulated to that finding which had been made in its earlier memorandum of decision on the temporary injunction. This finding has not been challenged on this appeal.

Despite the lack of such a challenge to the trial court's finding that the defendants' activities "altered" the watercourse on their property, the defendants stress a certain statement made by the trial court in the context of what constitutes an alteration of a watercourse

wherein the court postulated that if one had a small watercourse in his back yard and he threw a large rock into it, he would alter or divert it. Taking this statement, the defendants claim that such an alteration is not what the legislature intended when it created the exception found in § 22a-40 (a) (4) because it used the modifier "significant." Initially, we point out that the plain meaning which we must give to the statute provides no grist for the defendants' assertion that the modifier "significant" found in the provision at issue refers to the terms "diversion or alteration." It is quite clear from the statute as written that the modifier "significant" only refers to the word "amounts" in that statutory language which in turn clearly refers to the "removal or deposition of significant amounts of material from or onto a wetland or watercourse. . . ." While this does not mean that the diversion or alteration hypothetically stated by the trial court, which certainly contemplated a de minimis effect on a watercourse, is one which would come within the act, it is quite clear that the trial court's conclusion that the defendants' activities altered and diverted the watercourse within the meaning of the act was in no way predicated on the hypothetical it posed.

The trial court, as its memorandum noted, had viewed the property. A view of the subject matter in dispute may be taken by the court, in the exercise of a sound discretion, "whenever it is necessary or important to a clearer understanding of the issues." *Greenberg* v. *Waterbury,* 117 Conn. 67, 73, 167 A. 83 (1933); see *Mackin* v. *Mackin,* 186 Conn. 185, 190, 439 A.2d 1086 (1982). The court's findings, stated succinctly, establish that the defendants had constructed a dam on their property which had created a pond approximately thirty-five feet across and which had a capacity to hold back water to a level of about four feet above the

stream bed.[9] For over three years, commencing in July, 1977, there was a large V-shaped break in the dam, during which time there was essentially no water in the pond area. The defendants' activities in filling in this break in the latter part of 1980 resulted in the pond area filling with water "again." The trial court referred to a prior failure of the defendants' dam in 1975 or 1976 and found that although the potential failure of the dam in the future was not a threat to human life, it "would [cause] downstream damage by forceful removal of solid material, polluting the stream . . . changing its character [and] . . . adversely affect the streams and ponds below it, at least as far as 1000 feet downstream . . . ."

As we stated in *Aaron* v. *Conservation Commission,* supra, 538–39: "A statute should be interpreted according to the policy which the legislation seeks to serve. See 2A Sutherland, Statutory Construction (4th Ed.) §§ 56.01 to 56.02. General Statutes § 22a-36, which is entitled 'Inland Wetlands and Water Courses. Legislative Finding,' sets out in great detail the purposes of our legislature in enacting this act. After declaring that '[t]he inland wetlands and water courses . . . are an indispensable and irreplaceable but fragile natural resource,' and that their 'preservation and protection . . . from random, unnecessary, undesirable and unregulated uses, disturbance or destruction is in the public interest and is essential to the health, welfare and safety of the citizens of the state,' the section sets forth a number of the purposes behind the enactment of the act. The legislation, inter alia, seeks 'to protect the citizens of the state by making provisions for the

---

[9] The court found that by mid-December, 1980, after the defendants had filled in the V-shaped break in the earthen wing of the dam and had applied concrete thereon, the pond had reached a level of about one foot from the top of the center concrete portion. At the time when the court viewed the property in January, 1981, however, the pond "was no deeper than one foot."

protection, preservation, maintenance and use of the inland wetlands and water courses by minimizing their disturbance and pollution; [and by] maintaining and improving water quality in accordance with the highest standards set by federal, state or local authority . . . .' The act attempts to provide 'an orderly process to balance the need for the economic growth of the state and the use of its land with the need to protect its environment and ecology in order to forever guarantee to the people of the state, the safety of such natural resources for their benefit and enjoyment and for the benefit and enjoyment of generations yet unborn.' " (Footnote omitted.)

Under all the circumstances, we conclude that in view of what we have already set out regarding the nature and character of the defendants' activities, the trial court could properly conclude that their activities altered or diverted the watercourse within the meaning of the act.

Additionally, a separate basis exists under § 22a-40 (a) (4) upon which to sustain the trial court's decision in this case. Here we point out that neither of the parties has specifically addressed the consequence on this appeal of the trial court's finding that the defendants' activities "included removal or deposition of significant amounts of material from or onto a watercourse. . . ." This finding has gone unchallenged on this appeal and also provides a proper basis under § 22a-40 (a) (4) for the conclusion that the defendants had conducted a regulated activity for which a permit was required.

Likewise, the defendants' claim under § 22a-40 (b) (1) must fail. While that section also provides an exception from "regulated activities" for those operations and uses relating to the "[c]onservation of soil, vegetation, water, fish, shellfish and wild life . . ." such

operations and uses are limited to those which "do not disturb[10] the natural and indigenous character of the wetland or watercourse by *removal or deposition of material, alteration or obstruction of water flow* or pollution of the wetland or watercourse . . . ." From what has already been said above concerning the trial court's findings and conclusions concerning the defendants' alteration of the watercourse on their property, § 22a-40 (b) (1) avails the defendants nothing in this case.

### III

We turn next to the defendants' claim that the trial court's findings of fact that the defendants' dam caused downstream siltation were not supported by the evidence and, therefore, the court should not have granted a permanent injunction in the absence of a showing of present harm. Although the trial court's memorandum of decision contains a number of findings concerning the past harm and the potential for harm caused by the defendants' activities, in issuing its permanent injunction it expressly referred only to its determination that the defendants, in acting without a permit, had violated the Simsbury regulations promulgated under the act and that it had jurisdiction under General Statutes § 22a-44 (b) to issue "orders directing that the violation be corrected or removed." Claiming that the requested injunctive relief may be granted only upon the recognized principles of equity,[11] the defendants contest the

---

[10] The trial court also found that the defendants' action "disturbed the watercourse."

[11] The findings made by the trial court which we have examined concerning the harm caused in the past as well as the potential for harm caused by the conduct of this regulated activity without a permit by the defendants, all in derogation of regulations promulgated under the act, could, had the trial court specifically so concluded, have permitted the granting of injunctive relief "under recognized principles of equity." See, e.g., *Hartford* v. *American Arbitration Assn.*, 174 Conn. 472, 476, 391 A.2d 137 (1978); *Koepper* v. *Emanuele*, 164 Conn. 175, 178, 319 A.2d 411 (1972).

plaintiff's argument that the finding of the violation of the regulations was a sufficient basis under the statutory scheme to permit the issuance of the permanent injunction pointing to the rationale of *Water Resources Commission* v. *Connecticut Sand & Stone Corporation,* 170 Conn. 27, 364 A.2d 208 (1975). We agree with the plaintiff that the facts found by the trial court permitted the injunctive relief ordered for the violation of the town's regulations under General Statutes § 22a-42 (b).

This case is to be considered differently from a common law action for injunctive relief where allegations and proof of irreparable harm and lack of an adequate remedy at law are required. See, e.g., *Theurkauf* v. *Miller,* 153 Conn. 159, 161, 214 A.2d 834 (1965). "The rationale underlying [the] rule that the complainant is relieved of his burden of proving irreparable harm and no adequate remedy at law is that the enactment of the statute by implication assumes that no adequate alternative remedy exists and that the injury was irreparable, that is, the legislation was needed or else it would not have been enacted." *Crabtree* v. *Van Hise,* 39 Conn. Sup. 334, 338, 464 A.2d 865 (1983). Recently, the Connecticut Appellate Court adopted the Appellate Session's reasoning in *Crabtree* in *Johnson* v. *Murzyn,* 1 Conn. App. 176, 469 A.2d 1227 (1984) (zoning enforcement officer seeking injunction under General Statutes § 8-12 for violation of town zoning regulation not required to allege and prove irreparable harm and the lack of an adequate legal remedy). We have already set forth the "Legislative Finding" contained in General Statutes § 22a-36 which declares the purposes and policies of the act. Significantly, the legislature expressly provided in the act that the "superior court, in an action brought by the commissioner, municipality, district or any person, shall have jurisdiction to restrain a continuing violation of said sections, to issue orders direct-

ing that the violation be corrected or removed and to impose fines pursuant to this section." General Statutes § 22a-44 (b).

It is the court's duty to carry out the intention of the legislature as expressed in the statute it has enacted and to make the remedy it has provided an effective and efficient means of dealing with violations of the act and regulations properly promulgated under its authority. See *Water Resources Commission* v. *Connecticut Sand & Stone Corporation,* supra, 34. We point out, however, that "[t]he grant of jurisdiction to ensure compliance with a statute hardly suggests an absolute duty to do so under any and all circumstances, and a [trial judge] . . . is not mechanically obligated to grant an injunction for every violation of law. *TVA* v. *Hill,* 437 U.S. [153, 193, 98 S. Ct. 2279, 57 L. Ed. 2d 117 (1978)]; *Hecht Co.* v. *Bowles,* [321 U.S. 321, 329, 64 S. Ct. 587, 88 L. Ed. 754 (1944)]." *Weinberger* v. *Romero-Barcelo,* 456 U.S. 305, 102 S. Ct. 1798, 72 L. Ed. 2d 91 (1982). Put another way, we do not view the statutory grant of jurisdiction as destroying the discretion of a trial court in every case under this act. Given the purpose and language of the act and the factual basis for the violation, the injunctive relief was properly ordered.

## IV

Finally, we turn to the defendants' claim that the trial court erred in denying their motion to file a counterclaim. In this motion, which was first made at the trial in oral form on March 10, 1982,[12] the defendants alleged that certain Simsbury town officials and the town itself deprived the defendants "under color and

---

[12] The proceedings in this case took place on seven separate days. The hearings on the temporary injunction were held on January 5, 1981, and January 12, 1981. The hearings on the permanent injunction were held on March 10, 1982, March 11, 1982, June 11, 1982, June 15, 1982, and June 16, 1982.

pretense of statutes, ordinances, regulations, customs and usage of the Town of Simsbury and the State of Connecticut, of rights, privileges and immunities secured by the Fifth and Fourteenth Amendments to the Constitution of the United States." The counterclaim, as offered in written form, sets forth the claims of the defendants in six counts; it contains ninety-seven paragraphs and is twenty-one pages in length.

Practice Book § 116 provides in pertinent part: "Supplemental pleadings showing matters arising since the original pleading may be filed in actions for equitable relief by either party. In any action for legal or equitable relief, any defendant may file counterclaims against any plaintiff . . . provided that each such counterclaim . . . arises out of the transaction or one of the transactions which is the subject of the plaintiff's complaint; and if necessary, additional parties may be summoned in to answer any such counterclaim or cross claim."

It is apparent that the defendants' motion for permission to file their counterclaim was made as a direct result of the decision of the federal District Court to stay the action brought therein by the defendant Edmund W. Price pending the final resolution of the defendants' claims in our state courts. *Price* v. *Rust,* 527 F. Sup. 569, 577 (D. Conn. 1981).[13] The District Court stayed those proceedings on the basis of its application of the doctrine of "equitable restraint," analogiz-

---

[13] The United States District Court characterized the gravamen of Edmund Price's complaint as follows: "The thrust of plaintiff's complaint is that the defendants violated his constitutional rights by enforcing the Inland Wetlands and Water Courses Regulations of the Town of Simsbury (hereinafter Wetlands Regulations), thereby causing plaintiff to terminate certain maintenance operations he was performing on a pond located on his property. Plaintiff does not challenge the constitutionality of either the promulgation or the content of these regulations. Rather, plaintiff challenges the manner in which the regulations were enforced and the results of this enforcement." *Price* v. *Rust,* 527 F. Sup. 569, 570 (D. Conn. 1981).

ing Edmund Price's suit in the federal court to those cases in which a party seeks to enjoin state court proceedings, and pointing out that he had an "opportunity" to raise his constitutional claims in our state courts. *Price* v. *Rust,* supra, 573, 576–77.

In presenting this oral motion to the court for the first time on March 10, 1982, at the commencement of the trial on the permanent injunction, the defendants had not yet reduced their counterclaim to writing for formal presentation to the court. The counterclaim, which contained ninety-seven paragraphs of allegations and six counts, was not in fact filed until April 5, 1982. On March 10, 1982, the defendants' counsel, in arguing for permission to file the counterclaim, stated that he "would have to sweep into [this case] all of the [42 U.S.C. § ] 1983 allegations which were raised in the federal court." He also argued that he did not want the defendants to be in the position of having "waived" any of their rights.

In denying the defendants' motion, the trial court pointed out that the present case had been filed with a return date of December 22, 1980; that a temporary injunction had been granted and such cases should be expedited;[14] and that the case at that point in time during the trial was factually a relatively simple case, that the counterclaim would distort the matter and that it would be an improper exercise of the court's discretion to grant the defendants' motion.[15] We note, however, that immediately thereafter the court granted a subsequent motion of the defendants to file a special defense, the essence of which was that the conduct com-

[14] Our rules of practice provide that cases in which injunctive relief is sought are privileged cases. Practice Book § 259.

[15] Although the trial court denied the defendants' oral motion, it did permit them to file a written motion to file a counterclaim which included the counterclaim itself, for the purpose of allowing them to "[flush] out" their oral motion.

plained of by the plaintiff's amended complaint was "permitted as of right pursuant to General Statutes § 22a-40 (a) (4) and § 22a-40 (b) (1)." The plaintiff stated that it had no objection to this motion.

We have previously pointed out that the underlying purposes of Practice Book § 116 are " 'judicial economy, avoidance of multiplicity of litigation, and avoidance of piecemeal disposition of what is essentially one action . . . .' " *Wallingford* v. *Glen Valley Associates, Inc.,* 190 Conn. 158, 161, 459 A.2d 525 (1983), quoting *Jackson* v. *Conland,* 171 Conn. 161, 167, 368 A.2d 3 (1976). Whether these policies are served by permitting a counterclaim is a matter for the trial court's discretion and its determination in that regard ought not be disturbed unless there is an abuse of discretion. *Wallingford* v. *Glen Valley Associates, Inc.,* supra; *Jackson* v. *Conland,* supra, 166.

The trial court in this case was presented with a ninety-seven paragraph counterclaim in six counts,[16] which sought to cite in additional parties and which raised numerous constitutional issues not previously raised at all before the court in the temporary injunction and not until the day on which the trial on the permanent injunction was commenced. Moreover, the trial court noted the tardiness of the motion to amend by adding the counterclaim. We also note that the federal court's decision in *Price* v. *Rust,* supra, was handed down on October 27, 1981, and yet the defendants did not move to amend by adding the counterclaim until the first day of trial which was more than four months later and that the counterclaim itself was not in fact filed in court until over five months after the federal court's decision. Considering these factors, as well as

---

[16] When seeking the trial court's permission to file its counterclaim, the defendants' counsel told the court that the defendants' federal court pleadings, which they desired to bring before the trial court in their entirety, consisted of six counts and one hundred and three separate allegations.

the posture of the case at the time the motion was made, as one dealing with permanent injunctive relief, we cannot say that the trial court abused its discretion in denying the defendants' untimely motion for permission to file its counterclaim.

There is no error.

In this opinion PETERS and GRILLO, Js., concurred.

SHEA, J., with whom PARSKEY, J., joins, concurring. I disagree with the portion of the majority opinion which concludes that the defendants' activities in repairing the break in the earthen part of the existing dam could reasonably have been found by the trial court to constitute the "alteration" of a watercourse and thus a "regulated activity" under General Statutes § 22a-38 (13). The "maintenance of existing structures" is expressly included as one of the incidental residential uses of property which "shall be permitted in wetlands and watercourses, as of right . . . ." General Statutes § 22a-40 (a) (4). Such an activity, therefore, does not fall within the definition of "regulated activity" in § 22a-38 (13), which excludes "the specified activities in section 22a-40." It is undisputed that the dam which the defendants sought to repair was an "existing" structure and I fail to comprehend why their efforts to repair the break in the earthen portion did not constitute "maintenance" within the intent of § 22a-40 (a) (4) as the majority opinion assumes. To find that simply by repairing the dam the defendants were engaged in the "alteration" of a watercourse and thus a "regulated activity" renders wholly illusory the exemption which the legislature explicitly created for "maintenance of existing structures" as an incidental use of residential property which is "permitted in wetlands and watercourses, *as of right.*" (Emphasis added.) General Statutes § 22a-40 (a) (4).

I agree, however, with the alternative ground upon which the majority opinion sustains the judgment of the trial court. The exemption from the "regulated activity" definition of § 22a-38 (13) for uses permitted by § 22a-40 (a) (4) "shall not include removal or deposition of significant amounts of material from or onto a wetland or watercourse . . . ." As the majority note, the finding has not been challenged that the "[d]efendants' actions included removal or deposition of significant amounts of material from or onto a watercourse . . . ." Since the defendants' activities in repairing the dam involved such consequences, they did not qualify as "permitted operations and uses" under § 22a-40.

Accordingly, I concur in the result.