[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
The plaintiff Rovic, Inc. ("Rovic") employed the defendant Gary Hanson for approximately seventeen years. In June, 2000, Hanson left the employ of Rovic and went to work for a competitor, the defendant CC Janitorial CT Page 12088 Supplies, Inc. ("CC"). Rovic instituted the present action against Hanson, CC and Laura Tarantino,[1] another former Rovic employee who left to work for CC. Rovic alleges that it has been damaged as a result of the defendants' use of its trade secrets and it seeks injunctive and declaratory relief The question of whether one or more temporary injunctions should be issued to enjoin the defendants from using certain claimed trade secrets and from contacting certain customers during the pendency of the action is currently before the court.
The following facts were developed over portions of two days of testimony. Gary Hanson was a sales person for Rovic. Rovic is in the business of selling cleaning supplies and ancillary equipment to commercial customers. Over the years Hanson successfully developed a number of accounts, and by all accounts was an accomplished salesman. Over the years he developed friendly relationships with various customers, and he of course knew the appropriate people to contact at the businesses. Hanson knew the sales practices and, to an extent, the pricing procedures, at Rovic, and he had access to computerized information which, inter alia, encapsulated the customers' buying history.
Toward the end of 1999, Rovic instituted changes in its compensation program, and Hanson felt that he was making less money as a result of the changes. He discussed the issues with managers at Rovic, and they were unable to resolve their differences. Hanson then wrote a letter of resignation, dated June 9, 2000, which purported to be effective June 23, 2000. He indicated in the letter that he was planning to work for CC Janitorial Supplies. On June 9, he had a discussion with management at Rovic, and he was asked to reconsider. Perhaps as a precaution, Hanson's access to voice mail and his computer password were terminated on June 9.
On June 14, 2000, Hanson met with Damon Pelletier, Rovic's general manager; for some of the time Executive Vice President Reichelt was present. At this meeting Hanson indicated that he had not changed his mind about leaving. June 14 was a Wednesday. On the preceding Monday and Tuesday, Hanson had called some of his customers and told them he was leaving. At the June 14 meeting, Hanson and Pelletier signed a handwritten document which listed the eight accounts which Hanson had contacted; the document further states that "the customers will decide who they will buy from and we will decide how to communicate to the customers what their best interests are." The memo also stated that Hanson had returned all computer files "pertinent to Rovic" and had "removed" them from his own computer, and that he had returned all software and sales information to Rovic. On June 14, Hanson left Rovic's employ and virtually simultaneously began employment with CC, which is a CT Page 12089 competitor of Rovic in regard to many, but not all, of the services offered by Rovic.
On the basis of these facts,[2] Rovic seeks two temporary injunctions. First, it seeks an order prohibiting Hanson or CC from soliciting business from any of the customers named in the June 14 memorandum. Second, it seeks a more general injunction prohibiting the disclosure of confidential information, which requested injunction apparently would prevent Hanson and CC from soliciting any customers with whom Hanson dealt while at Rovic.
The standards for issuing a temporary injunction are well established. Factors to be considered include a balancing of the benefits and harms to the parties if a temporary injunction is imposed, the consideration of irreparable loss if an injunction is not issued, the effect on any public interest, and the relative likelihood of success on the merits. See, e.g., Griffin Hospital v. Commission on Hospitals and Health Care196 Conn. 451, 457-58 (1985).[3] Where, as here,[4] injunctive relief is a specific statutory remedy, the requirements for a permanent injunction are relaxed to the extent that showings of irreparable harm and no adequate remedy at law are not inflexibly required. ConservationCommission v. Price 193 Conn. 414, 429 (1984), and authority cited therein. It follows that the requirements for issuing a temporary injunction should similarly be relaxed, but equitable principles nonetheless govern the issue and trial courts are vested with discretion in the determination of whether a temporary injunction should issue. See, e.g., Conservation Commission v. Price, supra, 430. "Decisions of our trial courts have frequently referred to the burden of an applicant (for a temporary injunction) to show reasonable degree of probability of success before a temporary injunction to preserve the status quo may be granted." Environmental Products Corporation v. Lincoln1995 Ct. Sup. 5264 (Levi, J.) (1985).
The statutory framework governing the confidentiality of trade secrets is set forth in the Uniform Trade Secrets Act, §§ 35-50 of the General Statutes. A "trade secret", as the definition may be pertinent here, includes "information, including a . . . compilation, program, . . . cost data or customer list that: (1) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use, and (2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy." Section 35-51 (d) of the General Statutes. As pertinent to the case at hand, "misappropriations" means ". . . disclosure or use of a trade secret of another . . . by a person who . . . (B) at the time of disclosure or use, knew or had reason to know that his knowledge of the CT Page 12090 trade secret was . . . (ii) acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use . . . or (iii) derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use . . ." Section 35-51 (b) of the General Statutes. Pursuant to § 35-52 (a) of the General Statutes, "[a]ctual or threatened misappropriation may be enjoined upon application to any court of competent jurisdiction."
Connecticut enacted the Uniform Trade Secrets Act in 1983. The common law had created a body of law which is largely consistent with the Act.Town Country House Homes Services v. Evans, 150 Conn. 314 (1963), for example, involved a factual context fairly similar to that presented in the present case. The defendant Evans had been employed by the plaintiff in the housecleaning business. Before he left the plaintiff's employ, he told a number of the customers for whom he provided service that he was planning to leave and he solicited business from them. The trial court had held that there had been no particular confidentiality in the relationship between the plaintiff and the defendant and that customer list was not secret; that court decided, then, that, in the absence of an agreement not to compete, the defendant was free to start his new business and to solicit customers from the plaintiff
The Supreme Court reversed. It stated that an employee has a duty to exercise good faith and loyalty to his employer during the term of employment, such that he has a duty not to compete with the employer during the term of the employment and may not solicit the employer's customers for another enterprise at that time. But in the absence of a covenant not to compete, he is entitled to plan a new business during the time of employment and to solicit his former employer's customers immediately after terminating employment.[5] "Knowledge acquired by an employee during his employment cannot be used for his own advantage to the injury of the employer during employment." Town Country House Homes Service supra, 317. Because the defendant had solicited customers of his employer while he was still in the course of that employment, the employer was entitled to injunctive relief prohibiting him from performing any service for any customer who was solicited during the term of employment.
A second issue was whether the names of the customers were a trade secret of the employer. The court stated the common law definition of a trade secret, which is very similar to the statutory definition appearing in § 35-51 of the General Statutes. A trade secret "may consist of any formula, pattern, device or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it. It may be a . . . list of customers." Id., 318. Matters of public knowledge or of general CT Page 12091 knowledge are not trade secrets; a "substantial element of secrecy must exist" so that it would be difficult to obtain the secret except by improper means. Id., 319. Factors which may be considered in determining whether certain information is a trade secret include "(1) the extent to which the information is know outside the business; (2) the extent to which it is known by employees and others involved in the business; (3) the extent of measures taken by the employer to guard the secrecy of the information; (4) the value of the information to the employer and to his competitors; (5) the amount of effort or money expended by the employer in developing the information; (6) the ease or difficulty with which the information could be properly acquired or duplicated by others." Id. The common law imports into every contract of employment an obligation not to use an employer's trade secrets to the detriment of the employer. A list of customers may be a trade secret; but if the identity of customers is readily ascertainable "through ordinary business channels or through classified business or trade directories, the courts refuse to accord to the list the protection of a trade secret. Id., 320.
The Supreme Court concluded that if the plaintiff's list of customers was a trade secret, then the defendant would properly be restrained from doing business with any of the customers on the list, regardless of whether he had solicited them for a competing business during the term of his employment. Because the facts of this case were not sufficiently developed to form a proper conclusion on this issue, the case was remanded for a new trial.
In Holiday Food Co. v. Munroe, 37 Conn. Sup. 546 (App. Sess. 1981), the Appellate Session used a similar analysis in an analogous factual pattern, though the result was considerably different. The first question was whether the employee had solicited customers during the term of the former employment. The facts in Holiday Food however, were that even though the former employee had developed significant relationships with various customers during the term of employment and had become personal friends with a number of them, he did not actually solicit their business for another enterprise during the course of employment. The court held that, in the absence of acts of actual solicitation for a competing business during the former employment, an employee is not barred after employment from soliciting customers of the employer, unless the knowledge of the customer is a trade secret. Id., 549-50.
Turning to the issue of whether knowledge of the customers was a trade secret, the court noted first that the question was one of fact and, although various factors could be used to help in the determination of whether particular information was a trade secret, there is no talismanic weighting or balancing of the various factors. Each case will be resolved on its own facts and circumstances. CT Page 12092
The facts in Holiday Food compelled a conclusion that the list was not a trade secret. Among the considerations were facts that (1) the defendant took the list with the knowledge of the employer; (2) there was no covenant not to compete; (3) the list was not hidden; (4) the list was not critical to the continued operation of the plaintiff's business; (5) customers who were solicited after termination of employment were friends of the defendant; (6) the identity of the customers could have been determined simply by watching the plaintiff's trucks making deliveries; (7) no detailed information regarding buying habits or preferences were involved; and (8) there was no especially confidential relationship between the plaintiff and the defendant during the term of the employment. Id., 553-54. The determination of the trial court that no misappropriation of a trade secret had occurred was upheld. Justice Shea concurred in the result; he stated that there was little need to undertake a detailed analysis of considerations regarding trade secrets because the employee had, essentially, taken only his memory from the employer, and in the absence of a noncompetition agreement, an employee ought to be able to think he could later solicit business from friends that he had made during the course of a former employment.
A Superior Court case, Transam, Inc. v. Zhawred, 1 Conn.L.Rep. 672 (1990), further examines some of the criteria in the consideration of whether a customer list is a trade secret. It noted that in Connecticut, under the Uniform Trade Secrets Act, the party sought to be enjoined does not have the burden of showing that he actually relied on "innocent" sources to discover the information in question, but only that the information be readily ascertainable by proper means. It stated that if the list in question could have been obtained by consulting the Yellow Pages or walking down the street, it would not be accorded the protection of a trade secret. "In perhaps an even more striking example, physical customer files which contained customer names in combination with other information such as financial and family date, insurance history, current insurance coverage, policy renewal dates, claims information, and correspondence were not given trade secret status in an action for a preliminary injunction." Id., 675.
I first apply the above considerations to the question of whether the defendant is to be enjoined from contacting or soliciting business from the specific customers whom he contacted just before leaving Rovic. The determination of this question does not directly require the resolution of the trade secret issue; rather, under authority such as Town CountryHomes the sole issue on the merits is whether Hanson solicited their business for CC before he left Rovic. Hanson called approximately eight customers in the two days before he left Rovic to tell them he was leaving. Hanson testified that he did not solicit their business, but CT Page 12093 only called them as a courtesy and told them that someone else from Rovic would be handling their account. Letters from three of the customers state that Hanson did not solicit their business. It is not entirely clear that Hanson told them where he was going. All or most of the people with whom Hanson spoke were people with whom he had become quite friendly over the years. In its brief Rovic argues that it strains credulity to think that there was no effort to solicit business, regardless of the explanations. It may well be that behind every courtesy there is a marketing effort, but, although it is a fairly close question, I do not find that success on the merits is probable, especially in light of the plaintiff's burden of proof
The other factors to consider in determinating whether to grant a temporary injunction do not tip the scales in favor of the plaintiff Although some harm may inure to the plaintiff if an injunction does not issue, some harm may inure to the defendant if it does. So far as the public interest is concerned, it is true that the fiduciary duty owed to employers is an important consideration. But the granting of a temporary injunction would also, to an extent, have a negative impact on the free marketplace, which would certainly seem to be a value of some weight. In sum, I do not find that the equities support the issuing of a temporary injunction.
The second issue is whether the customer list information constitutes a trade secret, such that solicitation of all customers ought to be enjoined. Several additional facts should be considered in this regard. First, the defendant signed at least three confidentiality agreements over his years of employment with the plaintiff and its predecessor entities. These agreements recognized that information regarding Rovic's customers was considered confidential, and the employee agreed not to disclose or use such information. The employee agreed to return all software and flies regarding customers and all other information of Rovic. The employee agreed not to use any of Rovic's materials or information gained from them to solicit any Rovic customer. (Exhibit 1). Further, the customer information in Rovic's computer system was protected by use of passwords. Without reciting all of the evidence on the efforts of Rovic to keep such information secret, I found that sufficient efforts were made to satisfy the requirements of §§ 35-51 (d)(2) and the corresponding element of the common law cause of action.
The difficulty is whether the evidence supports a finding of probable success on the merits regarding subsection (1) of § 35-51 (d): more specifically, whether the customer list is not readily ascertainable by proper means. The accounts were overwhelmingly commercial institutions whose identities would be available through common knowledge of the area, rides through town, reference to journals, directories and CT Page 12094 cybersources, some of which were entered into evidence by the defendant, and undoubtedly many other ways. In reference to the several factual situations chronicled in Zhawred, supra, the ease of ascertainment of customers through proper means in this case is apparent. Further, there was evidence that many of the contacts were personal friends of Hanson, and there is no requirement that an employee leave his memory with a former employer. In the spectrum of cases concerning customer lists, the facts of this case fall rather decidedly on the side of those not receiving the status of trade secret.
I find, then, that the probability of success on the merits is not a factor favoring a temporary injunction. Other factors also do not militate in favor of such an injunction. The harm to the plaintiff in not ordering an injunction is conjectural: we have no way of knowing whether customers will flee Rovic. We also, of course, have no way of knowing whether Hanson would be harmed by the imposition of an injunction, because we cannot predict that Hanson will attract any of the customers without an injunction.
Finally, the plaintiff has suggested that the information about various customers, including buying history and other pertinent material, should be protected as a trade secret. Even if such information is considered a trade secret — and much of it probably is protected — there has been no showing that Hanson would use such material[6] and, in any event, its value is substantially ephemeral. Pricing information and costs to Rovic change over time, as do customer needs and preferences.
In light of all of the relevant considerations, the motion for temporary injunctions is denied.
Beach, J.