[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
The plaintiff moves for a temporary injunction, pending a determination of an arbitration proceeding, to restrain the defendants from seizing certain assets, terminating a certain recycling agreement, and interfering with the right of the plaintiff and its customers to utilize a certain recycling facility.
The facts are as follows:
The plaintiff, Connecticut Resources Recovery Authority (hereinafter "CRRA") is a public instrumentality and political subdivision of the state of Connecticut, established pursuant to Connecticut General Statutes § 22a-261, to provide refuge disposal and recycling services to approximately three quarters of the state of Connecticut. In furtherance of its statutory mandates, CRRA contracts with numerous municipalities to recycle their trash. On or about November 28, 1990, CRRA entered into a Regional Recycling Center Construction and Service Agreement (hereinafter "Agreement") with Capital Recycling of Connecticut, Inc. (hereinafter "CROC") which provided for CROC to construct and operate a recycling facility on Murphy Road in Hartford and CT Page 6026 to market commercial recyclables and other products. On or about November 30, 1998, the Agreement was assigned from CROC to the defendant American Disposal Services of Missouri, Inc. (hereinafter "ADS") under which ADS agreed to perform all the terms, covenants and conditions of the Agreement. At the time of the assignment, ADS purchased the assets of CROC and now conducts business under the name of Capital Recycling of Connecticut, and at that same time the defendant Allied Waste Industries, Inc. signed a guaranty of the obligations, performances and liabilities of defendant ADS.
The Agreement imposes upon the defendants (hereinafter collectively referred to as "Allied") the obligations to receive and process two types of waste materials: commercial recyclables and newspaper and corrugated cardboard (hereinafter referred to as "newspaper"). The commercial recyclables consist mostly of white paper collected from commercial establishments. They are processed and resold by Allied and, under the Agreement, the proceeds divided between Allied and CRRA. The evidence indicates this was the profitable part of the operation. It is not, however, at issue in the case before this court.
As for the newspapers collected from the various towns in Connecticut, the Agreement provides that CRRA will deliver to the Murphy Road facility a minimum of 2,365 tons per month, pay to Allied a base operating fee each year of $368,940.00, "for Newspaper and Corrugated Cardboard processed by the Facility up to and including 28,380 tons per year, payable in accordance with and . . . as further provided for in the agreement." The Agreement also provides that, at its option, CRRA may elect to market some or all of the newspaper and corrugated cardboard products independently of Allied, and if CRRA so elects, then the entire proceeds of the sale of the products go to CRRA. The Agreement also provides that each party shall have the right to terminate this Agreement for cause when there is an "event of default" on the part of the other party. Among the events of default are "failure on the part of CRRA to pay an undisputed amount required to be paid to [Allied] under this Agreement within thirty (30) calendar days after such amount becomes due and payable," unless Allied has given written notice to CRRA by certified mail specifying the particular default, and CRRA has not corrected such default within thirty (30) days from the date of receipt of the notice.
Finally, the Agreement provides as to arbitration the following:
Section 12.1 Scope.
 All claims, controversies and disputes concerning either party's performance of its obligations under this Agreement shall be finally decided by a single CT Page 6027 arbitrator in binding arbitration in accordance with the Construction Industry or other applicable rules of the American Arbitration Association ("AAA"), as modified by the provisions of this Agreement.
Section 12.2 Arbitration Procedure.
 (a) Either CRRA or [Allied] may initiate arbitration proceedings by giving notice of a dispute and a request to arbitrate to the other party and to the regional director of the AAA with jurisdiction in Hartford, Connecticut.
Section 12.3 Covenant to Continue Work.
 During resolution of any dispute under this [arbitration article], [Allied] and CRRA shall each continue to perform all of their respective obligations under this Agreement without interruption or slow down, provided that the undisputed portion of any disputed payment shall have been made by the party required to make same.
When Allied started its operation at Murphy Road in 1998, it received newspapers from the various towns, removed the contaminants, baled the paper through a large baling machine in the premises, sold the paper to a customer, and divided the proceeds with CRRA. For baling the paper and removing contaminants, Allied had charged CRRA $19.00 a ton. On or about December 1999, CRRA terminated Allied's right to sell newspaper, and entered into a contract with Garden State Paper Company, a subsidiary of Enron, Corp. for Garden State to purchase the newspaper in a loose condition. The function of Allied then became to accept the loose newspaper delivered by trucks from the various towns to the Murphy Road facility and transload it onto trucks of Garden State.
After Allied had only performed the transloading task, it still charged CRRA $19.00 per ton for the loose material shipped to Garden State. On November 30, 2000 it acknowledged that it was not entitled to that $19.00 per ton for this service. As a consequence, it credited CRRA for the months of December, 1999, January 2000, and February 2000, by deducting the amount of $19.00 per ton for those months from the amount CRRA owed it.
In 2000 CRRA was not paying Allied anything for transloading loose paper and the parties met to establish a price for that service. In or about June 2001, the parties agreed that CRRA would pay Allied the amount of $4.00 a ton for the loose material placed upon Garden State Truck. CT Page 6028 Allied claims that this agreement was as a consequence of a larger global arrangement to settle all disputes between the parties, a settlement that was not finalized. However, the court finds that the agreement of $4.00 a ton for handling the loose materials was limited to that issue and not a part of any global settlement between the parties.
For the months of June, July, August and September and Allied sent to CRRA a bill for handling the loose paper at the rate of $4.00 a ton. In December 2001, it sent a bill for the service at $19.00 a ton.
The parties continue to disagree over many aspects of the contract, particularly, amounts owed by one to the other. They attempted to resolve the disputes by negotiations, and, eventually, on December 11, 2001, Allied's attorney wrote to CRRA that unless an agreement could be reached by December 14 and CRRA paid Allied's invoice of $676,626.08 by that date, Allied "will take immediate possession of all the equipment fixtures and other elements constituting the facility and cause all obligation and rights under the Agreement of 1990 to cease. The effect of this action shall be taken pursuant to the valid contract between. [the parties] which will allow Allied to ban all personnel, equipment, suppliers or customers of the facility for any purpose, including the off/loading waste materials to transport to Garden State."
On December 13, 2001, CRRA issued to the defendants a notice of dispute and a request to arbitrate pursuant to the Agreement. Items listed as disputed including Allied's claim of monies owed to it by CRRA for off loading materials onto the Garden State trucks, items owed to Allied for residue disposal, money owed to Allied for certain capital replacement costs, the failure of CRRA to comply with certain provisions of the agreement, and Allied's threat to take immediate possession of the equipment and to preclude CRRA from utilizing their recycling facility.
On December 14, 2001, CRRA sought an order to show cause why a temporary injunction should not issue and preclude Allied from terminating the Agreement and interfering with the right of CRRA and its customers to utilize the recycling facility. On that date the court, per Koletsky, J., issued a temporary restraining order to that effect.
Connecticut General Statutes § 52-422 clearly provides that the Superior Court, pending an arbitration proceeding, has the power "to make forthwith such order or decree . . . as may be necessary to protect the rights of the parties pending the rendering of the award . . ." Our courts have recognized the purpose of a temporary injunction is to preserve the status quo of the parties until a full hearing is held on the merits. Griffin Hospital v. Commission on Hospitals and Healthcare,196 Conn. 451, 457 (1985). A determination of whether to grant a CT Page 6029 temporary injunction lies within the sound discretion of the court. Id. at 459. In exercising that discretion, the court can balance the equities taking into account such factors as the likelihood of the plaintiff prevailing on the merits of its claim, irreparability of prospective harm to the plaintiff, the adequacy of remedy at law, and weighing the hardships flowing from issuing or denying the injunction. Id. at 458-459; Advest, Inc. v. Wachtel, 235 Conn. 559, 562-63 (1995).
In this case the court finds the evidence overwhelming that closing down the recycling of newspaper at the Murphy Road facility, as threatened by Allied, would result in a regional recycling crisis. It would cause the violation of state statutes mandating recycling, the violation of contracts with approximately 70 municipalities, and the disruption of municipal and commercial recycling efforts throughout the region. The buildup of newspapers at the curbside by virtually every resident in central Connecticut would be unimaginable. The court emphatically finds the plaintiff has established irreparable harm.
Moreover, our courts have held that the requirements for a temporary injunction are relaxed for a governmental entity, because it is assumed that when there is attempted interference with the furtherance of a legislative statute, there is irreparable harm and lack of an adequate remedy at law. See Conservation Commission v. Price, 193 Conn. 414, 429
(1984). The Connecticut General Assembly has devoted an entire chapter of the General Statutes setting forth the purpose, necessity and authority of CRRA. Chapter 446e, Sections 22a-257, et. seq. A temporary injunction here would enable CCRA to carry out its statutory mandate.
Moreover, our courts have regularly granted an injunction to maintain the status quo, pending an arbitration proceeding. NCO Teleservices v.Northeast Mortgage, No. CV 00-0159012, Judicial District of Waterbury, Leheny, J. (Sept. 21, 2000); Giavara v. Eicon Group, No. CV 319110, Judicial District of Fairfield, Levin, J. (May 5, 1995); Reichenbach v.McIvor, No. 93-0135577, Judicial District of Stamford/Norwalk at Stamford, Lewis, J. (December 2, 1994); see Goodson v. State,232 Conn. 175, 180 (1995).
The Agreement between the parties provides for arbitration in as broad a terms as is possible to express it. The scope of the arbitration clause embraces "all claims, controversies and disputes concerning either party's performance of its obligations under this agreement." Similar language has been interpreted by our courts to grant to the arbitrator the power to determine the arbitrability of any dispute arising under the contract. Welch Group, Inc. v. Creative Drywall, Inc., 215 Conn. 464, 467
(1990). CT Page 6030
Allied argues that the last phrase of the arbitration provision, namely that arbitration shall be in accordance with rules of the Arbitration Association, "as modified by the provisions of this Agreement," eliminates the obligation of arbitration. Specifically, Allied argues that the Agreement provides for its termination upon the event of default by either party and that here a default occurred, and, therefore, the remedy of the parties is termination of the agreement rather than arbitration. CRRA responds that there is no default event in this case because CRRA has not failed to pay an undisputed amount, claiming that the amount to be paid is very much in dispute and further, that no notice of default was sent as required by the Agreement. Moreover, the question of whether or not there has been a default event is for the arbitrator to decide. The court agrees completely with the plaintiff on this issue.
Thus, the court concludes that CRRA has established its right to the issuance of a temporary injunction in this case, pending the determination of the arbitration proceeding.
The purpose of a temporary injunction is to maintain the status quo. The court finds that for two years Allied has been transloading loose paper, dumped at its facility by trucks coming from the various towns, to trucks delivering the paper to Garden State and to a customer in Massachusetts that CRRA has recently contracted to accept the paper. Accordingly, the court orders that Allied continue to perform that same function until the arbitration has been determined.
The next question the court faces is that while the temporary injunction is in effect, what should Allied be paid for performing this service. In reaching a decision on this matter it is important to emphasize what the court is not deciding.
The parties are in dispute on many aspects of the agreement, including amounts owed by one to the other regarding the splitting of proceeds of sale of both the commercial recyclables and newspapers and the payment of base fees to Allied for "processing" newspapers. CRRA claims Allied by simply transloading loose newspaper is no longer processing it and is not entitled to $19 a ton. Allied claims the Agreement guarantees it a base fee amounting to $19 a ton. These are issues to be decided by the arbitrator. Moreover, the arbitrator may also decide the question of whether or not CRRA has violated the Agreement by terminating Allied's continuing to bale newspapers and sell them, as it had at the beginning of its operation.
The court here will only decide a fair fee to be paid to Allied for transloading the paper in the manner as it has in the last two years. It will so decide not under the Agreement but in order to be fair to Allied CT Page 6031 in its fulfilling the court's mandate pending the arbitration. The arbitrator may find the court's number to be too high or too low in light of the Agreement and, accordingly, make adjustments either way in his final determination.
The evidence on the issue of a fair fee to be paid to Allied for transloading during the interim period consumed most of the hearing before the court. Factored in calculating that fee was the costs attributed to the percentage of time a pay loader operator-devoted to the task and the number of sorters used in the transloading process to remove contaminants. Other factors were overhead costs and profit margin.
CRRA's first witness, Mr. Bzdyra, its senior analyst, based his calculation in part on the actual charge of $2.04 per ton imposed by Metropolitan District Commission during an emergency period when MDC transloaded papers onto Garden State trucks. He testified that amount of $2.04 per ton represented the cost to Allied of performing the service.
CRRA's second witness Mr. Koliani, a certified public accountant, based his calculation on overhead costs and the variables for the number of sorters and rates of profit from 3% to 15%. He concluded that transloading costs ranged from $2.34 a ton to $2.84 a ton.
Allied offered the testimony of its comptroller, Ms. Jefferson, who testified the cost to Allied of this service was $18.10 per ton. Her figure however, is based upon 90% of the time allocated to an equipment operator, when the evidence indicates far less time was used for the transloading process. Her figure also included two sorters and a laborer when the evidence revealed and the court finds that at the most one sorter was used. Her assumption is also based on attributing 62% of the total overhead of the Murphy Road facility to the cost of transloading loose paper, when that operation involved only two bays at the facility and representing only 8% of the total square footage of the facility. The court finds Ms. Jefferson's determination of $18.00 per ton to be unbelievable.
In June 2001, the parties negotiated at length about what would be a fair cost to pay for the handling of the loose paper. Together they calculated the cost to be $3.84 per ton, rounded off to $4.00 per ton. Allied billed CRRA this figure of $4.00 per ton from June through September, 2001. Accordingly, the court finds the parties negotiated that number in good faith, and determines that it represents the fairest amount to be paid to Allied for the service.
Allied contends that the figure was negotiated in the course or attempt to reach a global settlement between the parties as to all outstanding CT Page 6032 issues. This court finds the evidence does not substantiate that contention. The court finds that the parties negotiated during a time when CRRA was paying Allied nothing for its handling of loose paper. The parties were seeking to arrive at a fair price for that service. Negotiations focused solely on that issue and not on the global settlement they were seeking at a later time.
Thus, the court concludes that CRRA has established the requirements for the issuance of a temporary injunction pending arbitration of the disputes between the parties: namely, (1) its right to arbitration of the disputes pursuant to the Agreement between the parties; (2) irreparable harm if a temporary injunction is not issued; (3) a balance of the equities in its favor.
Respecting the matter of a bond, Section 52-472 allows the court to issue a temporary injunction in favor of the state or a public officer without requiring a bond. Moreover, this court finds that good cause has been shown that a bond is not necessary in this case.
The following temporary injunction is issued pending determination of the on-going arbitration:
1. Defendants are enjoined from unilaterally terminating the Agreement between the parties.
2. Defendants are enjoined from seizing the plaintiff's equipment, or precluding the plaintiff and its customers from utilizing the recycling facility in the same manner in which they utilized the recycling facility at the time that Judge Koletsky issued his restraining order on December 14, 2001.
3. The defendants shall transload loose paper at an interim charge of $4.00 per ton which may be adjusted by the arbitrator for this period in his determination of the disputes between the parties under the Agreement.
Robert Satter, JTR