[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
The above referenced matters were consolidated for trial and in fact tried together. Subsequent to the completion of the trial and the reservation of the decision by the court, the plaintiff, Michael Caltabiano, filed a motion to conform the pleadings to the evidence adduced at trial which motion was argued before the court and allowed on April 5, 1995. The net result is that the amended complaint dated February 15, 1995, the allegations of which will be the subject of this memorandum, is merely a repetition of the prior complaint upon which the actual trial was conducted with the court having allowed the plaintiff to file a sixth count the allegations of which mirror the allegations of the first count of the prior complaint but merely substitute in paragraphs 23 and 24, language that invokes relief under Conn. Gen. Stat. Sec. 22a-44(b).
In these cases the defendant Lois Jimmo, the record owner of the home was living at the premises with her husband the defendant Joseph Jimmo who might be accurately described as the active defendant herein. She knew of the construction being accomplished by her husband on the property, endorsed and approved of it and the court concludes has ratified the actions of her husband in connection with his activities on her property.
Based upon the relevant, credible, and admissible evidence and exhibits the court makes the following findings of fact and conclusions of law with respect to both cases.
The plaintiff, Michael Caltabiano, purchased property known as CT Page 4765 449 Stagecoach Road, Durham, Connecticut in December 1986 and at all pertinent times relative to this complaint has been the owner of said property. The plaintiff's property is located across said Stagecoach Road and to the north of property of the defendant, Lois Jimmo who is the record owner of 452 Stagecoach Road, at all times relevant to these matters. She resides at said premises with husband, the defendant Joseph Jimmo. Shortly after acquiring the property Mr. Caltabiano, the plaintiff, part of whose life's activities include excavating, excavated and constructed a pond on his property. This project was a considerable undertaking by the plaintiff since it measured to a depth of between 15 and 18 feet. The pond was fed basically by underground springs and some moderate degree of run off water which entered his pond through twin culvert pipes running under Stagecoach Road situated at the north west corner of the defendant's property. From early 1987 when the pond was constructed up until construction started on the defendant's property in the spring or summer of 1991, said twin culverts carried a moderate degree of clear non-silted water from defendant's property and entered into the plaintiff's pond. Upon completion of the construction of said pond, the plaintiff stocked it with trout and commenced to use it for several years for fishing and recreational swimming and other family recreational water uses. Prior to 1991, the plaintiff never experienced any difficulty with silted or polluted water entering into his pond through said twin culverts running under Stagecoach Road carrying drain off water from the wetlands on the defendants property. The pond was excavated to this substantial depth in order to provide cool water for the fish and to deter vegetation growth which does not appear to thrive in deeper pools to the extent that it does in shallow pools.
This lawsuit arises out of activities the defendants conducted on their property which the plaintiff alleges have caused damage to his property. Prior to the commencement of the construction by the defendant on their property in the summer of 1991, the plaintiff had used said pond for winter and summer activities and, as previously said, had never experienced any problems with the pond or the water entering it from sources outside the plaintiff's property to wit the defendant's property across the street.
The defendants' property consists of approximately 4 1/2 acres of land, a substantial portion of which property is designated appropriately as wetlands by the Durham Inland Wetlands Agency. Also, as previously alluded to, many of the activities and acts CT Page 4766 which underlay this litigation were taken in the defendant Lois Jimmo's name as the record owner of the property in the nature of applications to perform work, filed with the Inland Wetlands Agency and other agencies of the town. The defendant Joseph Jimmo actually performed and directed the construction which have brought about harm and damage to the plaintiff. The defendant Lois Jimmo was aware of the activities on her property, never did anything to halt them and thus gave her implicit consent by, in her own testimony leaving everything pertaining to the work on the property up to her husband, Joseph. The defendant Joseph Jimmo was in the excavation business and used his own equipment to perform the subsequently-described work on his property.
Prior to the defendant's commencing construction and excavation in the summer of 1991 on their property their engineer, Mr. Lambert, submitted plans as part of the application process to the Durham Inland Wetlands Watercourses Agency, herein after referred to as Agency. The plans were ultimately revised six times over the six months following the commencement of work on the property. The revised plans intended to reflect work that was actually done or which was in process. Much of the work done by the defendant was illegally done to the extend that it was actually accomplished and performed before plans were presented to and approved by the Agency.
A revised drawing indicated only some of the work that the defendants performed on their property. The defendants performed work beyond what is described and never obtained a permit or approval to so do. The plaintiff claims and the court finds that the work described and some of which is not described in said drawing constitutes the source and cause of the damages sustained by the plaintiff herein.
The principal, illegal and/or unreasonable activities undertaken by the defendants on their property were the grading and the filling of wetlands without appropriate permits; installation and origination of an artificial berm along the eastern boundary of the property which substantially interfered with the former prior natural flow of water from the adjacent mountain to the east over their land; the installation of a curtain drain on the eastern boundary which did not conform to plans approved by the Agency; the installation of a trench which also functioned as a curtain drain on the western boundary adjacent to the installation of their raised driveway. Said driveway and utility trench also interfered with the prior natural westerly flow of water through and over the CT Page 4767 defendants property, which areas of the defendants property had been duly designated as inland wetland areas. Furthermore, the defendants installed without appropriate permission a concrete pipe in the northeast corner of their property which localized flow of water in great amounts into the drainage ditch along Stagecoach Road. The defendant blocked the northern ditch along Stagecoach Road at the northwest corner of the property and prevented the flow of water to the westward without appropriate permit from the Agency.
Prior to the construction work of the defendants in the summer of 1991, there was a large wetland area on the defendants property. This area appeared prominently on drawings showing the property and was described by various witnesses including Miss Pruit who described how the water used to come onto the defendants' property from the east and would pond in the middle and either be absorbed down through the defendants' property or flow off the western boundary of said property. This ponding and inland water westerly runoff process had continued for a great many years and as she described the area it was appropriate for her use in training her horses to go through shallow ponds of water. Prior to 1991 this wetland area had been vegetated heavily with plants and had acquired a substantial root mat to the extent that it would retain water after a rain storm and ultimately filter the water down through or run off over the western boundary of the land. The combination of the elevation of the wetlands and the vegetation which previously existed had the effect of detaining, absorbing and filtering the water which accumulated on the defendants' property.
The defendants graded and filled part of the wetlands area on the property without a permit to do so and in the face of a specific representation from the enforcement officer that such action would be illegal. As a result of the defendants actions the wetlands were methodically devegetated, and, fill excavated from the curtain drain on the eastern boundary was spread into the wetlands area, changing the elevations. Some portion of the wetlands to the north were filled in by as much as a two foot elevation.
Vegetation which now exits on the defendant's property is sparse in comparison with its former vegetation condition and lacks the capacity to absorb, detain and filter surface water in the way that it originally did. This, in conjunction with the alteration of elevations in the wetlands resulted in surface run off from the defendants property accumulating silt and then flowing to the CT Page 4768 northern drainage which parallels Stagecoach Road. Ultimately this water flows to the west and into culverts which lead under Stagecoach Road and into the plaintiff's pond and is the proximate cause and substantial factor in creating this siltation and pollution which has accumulated in the plaintiff's pond. Said siltation continues up to this date to accumulate in the pond. A permit was never obtained to grade, fill or devegetate the wetlands or to perform any activity in the wetlands at all. The court finds that the activities of the defendant have caused silt to be deposited into the plaintiff's pond which now has accumulated on the bottom to a depth from 7 to 24 inches.
Prior to the 1991 construction by the defendants, there existed a small berm at the northern edge of the east boundary of the defendants and also at the southern part of the east boundary near the defendants house. No berm existed in the central portion of the east boundary of the defendants property prior to commencement of this construction work. Material excavated from the eastern boundary curtain drain was used to create an artificial berm on the central part of the eastern boundary. This berm ranges as high as three to four feet in some areas. Prior to the creation of the berm, and as a result of the natural elevations to the east of the property and on the defendants property itself water would flow from the east through the central part of the east boundary of the defendants' property then to west across what is the wetlands area. As a result of the defendants placing of the berm in the middle section of the eastern property water from the east is now shunted down the eastern boundary into the area which has been referred to as Lime Kilm Road. This diverted water picks up sedimentation from the berm and runs down the eastern boundary into the ditch at the north boundary of the defendants property. Ultimately this water flows west through the twin culvert pipes and into the plaintiffs' pond and is the large source of silt deposit that has been unlawfully and illegally carried into the plaintiffs' pond from the defendants' land. No permit for said berm on the eastern boundary on the defendants' land has ever been sought or granted.
The major contributing cause to the damages sustained by the plaintiff originate from the construction of a huge curtain drain along the eastern portion of the defendants' property. A revised submission to the agency depicted a curtain drain on the east boundary of the defendants' property which runs the full length of the property, approximately 850 feet. As permitted and allowed, the drain was to be approximately 15 feet at its deepest point and CT Page 4769 two feet wide filled with 1/2" crushed stone and wrapped completely in an envelope of filter fabric. The approved design also called for solid P.V.C. pipe to sit on top of the crushed stone envelope. The drain that was actually constructed was four feet to six feet wide across and was not filled with 1/2" crushed stone but large stones or cobbles. The drain was left open and exposed to the elements for some months and portions of it almost a year after it had been excavated. There was no filter fabric envelope surrounding the stone although there might have been some filter fabric on top of the cobblestone at various points along the drain. The failure of the defendants to use fill fabric and small stones in the drain effects the filtering capacity of the drain in a negative and detrimental manner. The failure to use filter fabric in the drain particularly on the bottom will ultimately lead to its failure. In its current condition the drain's lack of filtering capacity results in more corroded sediment flowing from it than if it had been constructed according to the approved plan.
The length, width and depth of the curtain drain causes much as 40 to 60 gallons of water per minute to flow from the curtain drain. At times between 2,400 to 3,600 gallons per hour flow into the northern drainage ditch from the curtain drain and ultimately enter Mr. Caltabiano's pond. It is to be noted herein that prior to the construction work being done on this property, there was no constant flow of water into the plaintiffs' land and at times a moderate flow of clear unpolluted water. A typical curtain drain would empty a little as 1 to 2 gallons of water per minute. Prior to this construction the water which now flows through the drain was not channeled to the northern ditch or to the area of the plaintiff's pond.
The drawing submitted to the agency by Mr. Lambert showed a utility trench on the western boundary running adjacent to the defendants' driveway. The defendants converted the utility trench into a curtain drain to carry water from the property to the northern drainage ditch. Said drawing clearly depicts two types of utility trenches which deviate from standard construction. The reason for the deviation is to allow the trench to carry water from the property. The excavation and construction of the utility trench and curtain drain was performed before the agency had granted an approval. Water flows from the western boundary trench almost constantly and carries with it substantial amounts of siltation in the northwest corner of the defendants' property and then through the culverts into the plaintiff's pond. Prior to the installation of both the artificial berm on the east of the CT Page 4770 defendants' property and this driveway and curtain drain on the west bound of the property the water from the defendants' property either filtered down through the wetlands area or flowed off to the west to adjacent properties and streams to the west of the defendants' property. These installations substantially interfered with the prior and natural flow of water over and through the defendants' property.
The defendants also placed a large concrete pipe in the northeast corner of their property. The pipe runs in an east west direction. It channels water from the east of the property into the northern drainage ditch along Stagecoach Road. The concrete pipe does not appear anywhere on any of Mr. Lambert's plans for the general property and no plan for the installation of the pipe were ever presented or approved by the agency. The pipe has the effect of contributing any increase of water volume and siltation in the northern drainage ditch which ultimately was deposited into the plaintiff's pond.
Prior to the construction on the defendants' property in 1991 water that flowed to the northern edge of the property would then continue in a westerly direction, pass the defendant's property and the twin culverts, unless rain fall was so heavy as to bring the level of run off above the level of the twin culverts. This water when it so arose above the level of the culverts would then flow in what the plaintiff described as moderate amounts onto his land or into his pond after he had constructed it. The defendants have blocked this northern drainage to the west of what is now their driveway. Therefore, water can no longer flow as it did before pass the culverts and down Stagecoach Road to the west. The defendants actions have forced the water to flow into the culverts and thus into the plaintiff's pond. The defendants never sought nor obtained approval for the filling of the ditch to the west of their driveway. The effect of this filling in has caused polluted sediment and water to be channeled into the plaintiff's pond and increased the volume of water being now deposited into the plaintiff's pond from the defendants' property.
The disturbance of the wetlands in conjunction with the channeling effect of the other activities described on the defendants' property has resulted in large amounts of sedimentation flowing into the plaintiff's pond. After a normal to a heavy rain and at other times noticeable silt flows into the plaintiff's pond and the pond becomes brownish red color. Substantial amounts of silt have accumulated at the bottom of the plaintiff's pond and CT Page 4771 continues to accumulate. The material found at the bottom of the plaintiff's pond matches material found on the defendants' property. The silt flowing from the defendants' property as a result of their actions have made the pond more shallow than as originally constructed and has caused the pond to become substantially less usable or inviting for recreational summer uses. The increase volume of water has prevented the pond from freezing over completely in the winter as it formerly prior to in 1991 and render winter recreation use questionable. Prior to 1991 even after substantial amounts of rain being deposited such as from a hurricane the water that flowed from what is now the defendants' property into the plaintiff's pond was clear and never interfered with the plaintiff's use of his pond.
The court finds that for the plaintiff to restore his pond to its prior usable condition would require expenditure of $43,000. The use of a sludge pump to pull the silt from the bottom of the pond and store in it a detention area and ultimately legitimately distribute it on the plaintiff's land in accordance with approved practices is found by the court to be reasonable and necessary.
The court concludes that inland wetland comprises substantial portion of the defendants' property. Much of the wetland area has been graded and part of it filled by the defendants. The grading or filing of wetlands is a "regulated activity" under the appropriate regulations and as such may not be done without prior issuance of a permit. No permit was ever sought or obtained. The town engineer-enforcement officer testified that he explicitly told the defendant Jimmo that he could not fill the wetlands and the defendant simply ignored this admonishment. The court concludes that the wetlands were disturbed by the defendants without appropriate permission and accordingly finds violation of Conn. Gen. Sec. Sec. 22-a-44(b).
A water course is defined under the regulations to include a pond within the town of Durham and it is not a tidal wetland regulated by the State. The plaintiff's pond is therefore such a watercourse within the meaning of the local regulations. Pollution under the regulations includes but is not limited to erosion as resulting from any filling or excavation. No such pollution may occur without regulatory approval. The court finds that the plaintiff's pond has suffered some such pollution from a variety of the defendants' activities as aforementioned. The problem was acute during the period when the entire property was devegetated by the defendant and remains chronic now that there is sparse CT Page 4772 vegetation which lacks the dense rooting of original growth. The situation has resulted from the illegal actions of the defendants in conjunction with the unreasonable construction carried on their property. These pollution-causing activities have had the result of converting the defendants' property into sort of a dammed-up funnel that gathers water from different directions and channels it to the drainage ditch which leads through the culverts to the plaintiff's pond. Thus, the court finds that the defendant has again violated the provisions of the agency.
Under regulations 11.10.d an applicant is granted the right to perform certain activities on his property in conformance with a properly submitted application which the agency approves. The applicant remains under the obligation to prevent strong water discharge, erosion and sedimentation and the pollution of wetlands and watercourses. Therefore even though the defendants may have ultimately obtained a permit to construct the eastern curtain drain, to clear the northern drainage ditch and to convert the utility trench on the western boundary into curtain drain, they remained under an obligation to prevent erosion and sedimentation and the pollution of the plaintiff's pond. The evidence uncontrovertibly establishes that they failed to so do. The defendants may not use the shield of a permit in an effort to avoid responsibility for the damage they have caused and particularly when the work performed did not conform to the permit. Ferri v.Pyramid Construction, Co. 186 Conn. 682, 683-84 (1982). Thus for the violation of said Sec. 11.10.d. the plaintiffs are entitled to relief under the statute.
In the second count of the complaint, the plaintiff alleges common law trespass. In order to recover he must show ownership or possessory interest in property; the physical invasion, entry or intrusion by defendant which affects the plaintiff's possessory rights; intent to do that which causes the invasion and a direct injury to the plaintiffs' property. Avery v. Spicer, 90 Conn. 576,579 (1969). A landowner may not use or improve his land in such a way as to increase the total volume of surface water which flows from it to adjacent property. Melin v. Richman, 96 Conn. 686, the court finds that the plaintiff has established the elements of common law trespass and the intentional activities of the defendants have caused damage to his property. Under the allegations and proof of this count, the plaintiff has established his right to recover appropriate damages and to have the offending activities of the defendants restrained. CT Page 4773
In the third count of his amended complaint, the plaintiff alleges negligence. Under the allegations of this count it is necessary for a successful plaintiff to show the breach of a duty owed, injuries proximately resulting therefrom and damages. The evidence herein establishes that the defendants' property had a ground water condition and was lower from substantial surface run off from the south or to the rear of their property. Also it was lower and subject to substantial run off from property to east of said defendant's land. The wetlands, as they existed on the defendants property prior to their 1991 construction, detained, absorbed and filtered surface run off from the defendants property. The defendants scrapping, digging, gouging, filling of the property to redirect surface and subsurface water flow drastically affected the stability of the defendants' land and this was or should have been apparent to the defendant, Joseph Jimmo particularly since he was in the construction and excavating business. The defendant knew or should have foreseen that their actions would redirect the flow and increase the volume of water leaving their property and entering into the plaintiff's pond and caused erosion and the accumulation of sediment in said pond. The court finds based upon the opinions of Mr. Maganata that much of the engineering work pertaining to the Jimmo property fell below generally accepted standards for design and implementation. Work deviated from the permitted designs for the eastern curtain drain, performing work on the utility trench to the west without first obtaining a permit, grading and filling wetland without a permit, placing a concrete pipe in the northeastern corner of the property without a permit and filing the ditch to the west of the driveway without a permit all constituted deviations from acceptable standards and practice for the design and implementation of an appropriate engineering plan for the utilization by the defendant of his property. Placing a utility trench in the wettest part of the defendants' property on the western boundary was not well conceived and that using a curtain drain design for the purpose to relieve ground water pressure beneath their basement was inappropriate and futile.
The defendants owed a duty to the plaintiff not to cause harm to his property by the activity they conducted on their property. The evidence appropriately establishes that the defendants breached their duty to the plaintiff and that the plaintiff has suffered damage to his pond and will continue to suffer such a damage. Thus the court finds the plaintiff has established his entitlement to relief based upon negligence.
In the fourth count the plaintiff alleges a cause of action CT Page 4774 based on common law nuisance. The element thereof are that the conditions complained of had a natural tendency to create condition resulting in danger to or the infliction of injury upon person or property; that the condition created is a continuing one; that the use of the land was unreasonable or unlawful; that the existence of the nuisance was the proximate cause of the plaintiffs; injuries. Quinnett v. Newman, 213 Conn. 343, (1990). A nuisance can be created by intentional or negligent conduct. An absolute nuisance is created by intentional conduct. The evidence establishes that the defendants' property had previously functioned well as a wetland area. The defendants construction caused unnatural and excessive erosion and sedimentation to flow into the plaintiffs' pond. The activities of the defendants have caused ongoing continuing damage to the plaintiffs. The use of the defendants land presently constitutes a violation of agency regulations and constitutes a unreasonable use of their property. Simply stated, the defendants have imposed upon this wetland parcel of land construction of a residential property and the installation of a huge drainage ditch all out of proportion to the reasonable use of their land taking into account that the natural condition of said land imposes certain restrictions upon the reasonable use thereof. The court concludes that the plaintiff has established his entitlement to recovery on this common law count of nuisance.
In the fifth count of the complaint the plaintiff alleges the violation of his riparian rights or the right to the use enjoyment of waters existing upon or adjacent to real property. Damage to riparian rights is compensable in the same manner as damage to real property rights. A riparian owner upon a non-navigable water course has a constitutional right to make any use of the waters that does not interfere with the private riparian rights of other proprietors. The rights that may exist in an riparian owner are use of the water for recreation bathing and view. The evidence clearly establishes that the defendants activities on his land have caused huge amounts of silt to flow into the plaintiffs' pond. The volume of water flowing into the pond has also substantially increased since the defendants' construction on their property. The net effect has been a reduced fish population in the plaintiffs' pond and to make it less usable as a recreational pool and prevent winter activities thereon. Additionally the alteration and color caused by the siltation reduces the beauty of the pond. The plaintiff may recover under this count.
As aforesaid, the plaintiff has established his right to CT Page 4775 recover under the sixth count which was allowed by the amended complaint filed subsequent to the trial in order to conform the pleadings to the proof.
The court concludes that the plaintiff has established his entitlement to compensatory damages for the harm done to his property which are appropriately measured in the cost of remediation. Accordingly, the court finds that the reasonable cost of remediation is $43,000. The court further allows fees and expenses for Mr. Magnotta and Mr. Dorney's services in the amount of $5,281.25. Reasonable attorney fees allowable to the plaintiff are found by the court to be in the amount of $12,450. Judgment is entered in favor of the plaintiff Michael Caltabiano on his complaint for said amounts. The court declines to impose a penalty in this case in view of the relief accorded the plaintiff and the relief accorded to the consolidated plaintiff.
The court further finds that under Conn. Gen. Stat. Sec. 22a-44(b) the court is empowered to order injunctive relief where it finds a violation of the municipal wetlands regulation, of which the court so finds in this case. Conservation Commission of theTown of Simsbury v. Price, 193 Conn. 414, 428-29 (1984). Accordingly, the court does not have to find irreparable harm nor the lack of an adequate remedy at law pursuant to existing law in this jurisdiction. The defendant has violated said local regulations of the agency and the violations are ongoing. Accordingly, as further relief the court grants the plaintiff's request for an injunction and directs the counsel for the plaintiff to prepare and submit to the court in cooperation with the plaintiff agency an appropriate injunctive order which the court retains jurisdiction to execute and append to this memorandum of decision and judgment herein.
The court further finds as part of said injunctive order the court will enter an order of remediation. The court adopts as a appropriate and reasonable rationale for remediation of the defendants property the plan put forth by Mr. Magnotta. Accordingly, the counsel for the plaintiff is directed to include in said injunctive order the appropriate terms of remediation for the approval of the court.
Judgment is entered in favor of the plaintiff Michael Caltabiano as against the defendants in accordance with the foregoing. CT Page 4776
In conjunction with the companion action, that is, Durham Inland Wetlands and Watercourses Agency v. Lois and Joseph Jimmo, based upon the prior findings of the court it is concluded that this plaintiff has established its entitlement to relief as against the defendants herein. It is and has been found that the defendants have violated the appropriate regulations of the agency and has failed to comply with duly promulgated cease and desist orders. The court finds that said violation were intentional and willful. Accordingly, the court finds that this plaintiff is also entitled injunctive relief and counsel for the agency is directed to act in concert with the counsel for the consolidated plaintiff in preparing an appropriate injunctive order, which includes an order of remediation. Said order of remediation will also include for the benefit of this plaintiff terms that the appropriate work on the Magnotta restoration plan will be performed upon the plaintiff's property by persons selected by the agency and acting under the direction of Attorney Patricia Gillin who is hereby designated as a committee of the court to direct the remediation work. Her fee will be paid by the Town and/or the Agency.
This plaintiff has established its entitlement to relief and, in addition to the penalties imposed herein, the court awards judgment for attorneys fees in the amount of $12,000 to this plaintiff, the Agency, as against the defendants Lois and Joseph Jimmo. In addition, the court retains jurisdiction to supplement this award on behalf of the agency to include the future reasonable compensation for Attorney Patricia Gillin or such other person that the court may be required to designate in order to supervise the restoration of wetlands and reasonable costs of the persons and or companies employed by Mr. Magnotta and Attorney Gillin to accomplish the restoration on the defendants property. Each of these awards in favor of both parties shall be covered by a present and future judicial lien hereby created to secure payment of the current judgment plus amounts to which the defendant shall be liable to pay to the plaintiff agency in the future.
In addition and pursuant to Statute, the court imposes a fine of $100 per day from October 22, 1991 through May 1, 1995, 1285 days for an accrued fine of $128,500. Said fine will continue to accrue at $100 per day until remediation is completed. The court will retain jurisdiction to review only the future accruing fines after remediation is completed taking into account the cooperation of the defendants and the cost of remediation.
Judgment is entered in favor of each plaintiff as aforesaid. CT Page 4777
HIGGINS, J.