[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
This action has been brought by the plaintiff seeking injunctive relief against the defendants for violations of statutory and common-law trade secret law. The plaintiffs are LCD Lighting, Inc. and Light Sources, Inc. ("LCD Lighting") which are closely related corporations jointly involved in the manufacture of specialty lamps, particularly with reference to the avionics industry.
The defendants are John Andros and Robert Cassidy, both former employees of the plaintiff and now current employees of the other defendant, Voltarc, Inc. ("Voltarc") Voltarc is also a lamp developer and manufacturer with a specialty division also dedicated in part to the avionics industry. Both the corporate plaintiff and the corporate defendant are Connecticut companies, the plaintiff located in Orange and the defendant in Waterbury. They are leading competitors in their field nationally. Voltarc is a privately owned company with approximately 225 employees. Besides avionics, its specialty bulbs are manufactured for among other things signs and tanning.
This matter originally came to the court's attention through a special proceedings application for temporary injunction. The parties agreed to expedite their pretrial discovery process and try the temporary and permanent injunction applications together. The expedition of discovery included a reciprocal agreement to not depose experts. The plaintiff's complaint also contains causes of action other than trade secrets violations, and seeks both equitable and legal relief, including money damages. Those matters were not explicitly tried before the court and the failure of the parties and court to address that leaves the parties on an unfamiliar footing after the completion of these injunctive claims. Therefore, as to the remaining matters, the court schedules a status conference as reflected in the orders at the conclusion of this opinion.
The injunction hearing spread over numerous days from July through October 2002. Over seventeen witnesses testified with numerous exhibits CT Page 3650 entered. Thereafter, trial briefs were filed (and then refiled after both parties exceeded Practice Book page maximum limits without leave of the court) and final argument was heard on December 12, 2002.
 I. LAW AND DISCUSSION
A trade secret is "information, including a formula, pattern, compilation, program, device, method, technique, process, drawing, cost data or customer list that (1) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use, and (2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy." General Statutes Section 35-51 (d).
The trade secrets that plaintiff seeks to protect from actual and continuing misappropriation by the defendants are its manufacture process of the DU lamp, its pricing structure for the avionics lamp industry and its customer list for that same industry. Plaintiff seeks injunctive relief pursuant to C.G.S. § 35-52.[1]
The Boeing Corporation manufactures an aircraft called the Boeing 777. The Honeywell Corporation is responsible for overseeing the manufacture of the cockpit of the 777 aircraft. The instrument panel of a 777 is backlit by lamps. For many years, the cockpit panels of airplanes was analog. The time came, in the mid-1980s that Boeing and Honeywell sought to develop a liquid crystal display with florescent backlighting. Liquid crystal displays were considered beneficial since they were lighter in weight, had a longer life and offered better visibility in daytime. In the late 1980s, Honeywell sought lamp manufacturers to develop a florescent lamp that would meet the specifications and tolerances for the 777 instrument panel. At that time, the actual technology of the process for the manufacture of florescent lamps was well established and common knowledge within the lamp industry. The lamp that Honeywell sought development of for the Boeing 777 was called the DU lamp. Prior to 1992, no company had been successful in the development of a DU lamp of a quality sufficient to satisfy the Honeywell and Boeing specifications. Honeywell had, from the late 1980s solicited several lamp manufacturers, seeking to have more than one supplier developed for a DU lamp. The companies solicited at that time included the plaintiff and Voltarc, as well as several other lamp manufacturers. After preliminary interest by several companies, only the plaintiff engaged in the intensive process of product development with Honeywell from the late 1980s into the period of the early 1990s. Both Honeywell and the plaintiff invested significant financial resources by way of hardware and human resource time into the CT Page 3651 production by plaintiff of the DU lamp.
Honeywell also had need for a CDU lamp, which shared certain characteristics with a DU lamp but was simpler to manufacture. Both lamps are compact florescent lamps. The CDU lamp is smaller and has a lesser total luminescence output specified for it than the DU lamp. The plaintiff was successful in producing an acceptable CDU lamp much earlier than a DU lamp. The same has occurred at Voltarc; it had produced an acceptable CDU lamp for Honeywell much earlier than a DU lamp.[2] As to each lamp, when test results of tolerances suggest that the lamp can be successfully manufactured to specification, the manufacturer sends several examples of the product to, in this case, Honeywell for "red label testing," as it is called, to see if the product is successful. The plaintiff produced an acceptable CDU lamp in 1990 and acceptable DU lamp in 1996. It is that manufacture process that plaintiff claims has been and remains in danger of misappropriation. The Uniform Trade Secrets Act defines misappropriation:
Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or (2) disclosure or use of a trade secret of another without express or implied consent by a person who (A) used improper means to acquire knowledge of the trade secret; or (B) at the time of disclosure of use, knew or had reason to know that his knowledge of the trade secret was (i) derived from or through a person who had utilized improper means to acquire it; (ii) acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use, including but not limited to disclosures made under Section 1-210, Sections 31-40j to 31-40p, inclusive, or subsection (c) of Section 12-62; or (ii) derived from or through a person who owned a duty to the person seeking relief to maintain its secrecy or limit its use; or (C) before a material change of his position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake. C.G.S § 35-51 (b).
As of that date, plaintiff was the sole supplier of DU lamps to Honeywell for installation in the 777 cockpit. Over time, Honeywell became increasingly dissatisfied with having only one supplier of the DU lamp, for both proprietary and financial competition reasons. It again approached Voltarc to see if it would attempt again to develop the DU lamp. Prior to 1990, Voltarc had briefly tried, and then put the project aside when it showed no success and Voltarc desired to focus on other specialty lamp projects.
Furthermore, as Honeywell sought Voltarc to become an additional CT Page 3652 supplier, as the needs of Boeing and Honeywell changed, and as techniques were refined, LCD Lighting continued to work on its manufacture process for the DU lamp.
Joseph Laudano, Jr. is the president of Voltarc. In seeking to qualify Voltarc as a supplier of DU lamps, it had been his goal to be up and running as a supplier by the end of 2001. This work was commenced at Perkin-Elmer a predecessor company which became a part of Voltarc.
John Andros, a defendant in this action, worked at LCD Lighting from February 1996 to March 8, 2002. He did not sign a non-disclosure or a non-compete agreement with the plaintiff. On March 8, 2002, he quit his job without notice to the plaintiff and commenced work at Voltarc, Inc.[3] At the time that Andros left the plaintiff he was Vice-President and General Manager. Essentially he was in charge of the plaintiff's sales and marketing operation. He had regular contact with all of the plaintiff's customers, including Honeywell, interfacing with them through e-mail, telephone and occasional visits. In the course of his employment he learned the target prices Honeywell had set for the plaintiff on the CDU and DU lamps. He observed the DU manufacture process. He was intimately aware of LCD Lighting's pricing structure, overhead costs, profit markups and annual sales (by customer).
While Andros was in the plaintiff's employ, he was aware that Honeywell had been soliciting Voltarc to develop the technology to become a second source supplier of the DU lamp since August 1999.
Andros spoke with Joseph Laudano of the defendant's predecessor Perkin-Elmer in December 2000 and January 2001 about him going to work with them. That conversation was not pursued further at that time. However, in December 2001 he had renewed conversations with what was then Voltarc when, Laudano contacted him again; at that time he discussed employment with Voltarc over a dinner with Laudano and Vincent Mehta, the CEO of Voltarc. By the time of this recruitment of Andros, Laudano knew that the DU lamp plan was behind schedule; red lamps had not even been sent yet to Honeywell. Laudano recruited Andros for the specialty lamp division, which included avionics. He had worked with Andros before, since Andros had been with his company for two employment periods in the 1980s, each about two years.
The dinner conversation in December 2001 culminated in Andros' resignation from the plaintiff and employment with Voltarc on March 8, 2002. Throughout this period, Andros was aware that Voltarc had, to date, been unsuccessful in its attempts to develop the DU lamp for sales to Honeywell during the time of these conversations that culminated in CT Page 3653 his employment.
When Andros worked at LCD Lighting, he had a computer assigned to him, which contained the business files of the corporation. His desktop unit was wired to the company network and he had access to all of the network files. He also was able to download such information as he desired from the network onto his desktop and copy it onto discs. Through this computer access and his working knowledge as an employee of the plaintiff, Andros had access to and knowledge of the plaintiff's pricing matrices, price quotations for customers and capacity analysis of production ability. At the time of his resignation from plaintiff he was aware of the plaintiff's pricing information for its customers.
Andros did not have access through the computer to that information reserved to the officers of the corporation. Therefore, plaintiff's computer access restriction gave him unfettered access to sales and pricing, but not other parts of business.
In the last three weeks before Andros left, he copied all of the company files he had on his desktop to floppies. He informed no one at plaintiff corporation that he was leaving in advance of his actual leaving at 5 pm on the 8th of March 2002. Immediately prior to leaving the plaintiff, Andros attempted to wipe his desktop computer free of any company and personal information he had stored on it. He denies downloading this information to floppies. He claims that he wiped floppy discs clean as well. There would have been no reason to wipe off his computer business proprietary information belonging to plaintiff except to hide from plaintiff the information he had. Plaintiff's forensic witness, David Stenhouse, established to the satisfaction of the court that it is more probable than not that Andros copied these files to floppy discs before erasing them. The documents downloaded to floppy discs included price offering from plaintiff to Honeywell for six kinds of fluorescent lamps (including the DU lamps) for 2001 to 2004. While their prices were not accepted by Honeywell, Andros carried with him to Voltarc valuable pricing information. The same is true regarding documents detailing capacity analysis for certain lamps for 1998 to 2000. While the time period was past when Andros left, the documents illuminate demand and capacity abilities of the plaintiff.
On March 9, 2002, which was a Saturday, upon commencing his employ with Voltarc, Andros sent an e-mail to a variety of business, approximately 90% were customers of plaintiff (about 50 to 60 customers of LCD Lighting) although many did business as well with Voltarc. The e-mail stated: CT Page 3654
In the past six years, as LCD Lighting's Vice President and General Manager, I have had the pleasure of working with all of you directly or indirectly through my staff. And with many of you, I have had the great fortune in establishing both a strong business and personal relationship over these six years. Relationships I look forward to continuing in the coming weeks, months and years.
So, I'm sure it is with some degree of surprise for you to learn that on Friday (3/8/02) I resigned from my VP and GM position and terminated employment with LCD Lighting. Effective on Monday (3/11/02) morning, I assume my new responsibilities and duties as Vice president, GM, Business Leader for Voltarc Technologies' Fluorescent Lamp LED Divisions.
In my new position at VTI, I'll have complete profit and loss (PL) control and responsibility for the fluorescent lamp business unit, and as such, I'll be seeking you and your companies out to make short and/or long-term business deals that will forge "Win-Win" Business Partnerships between our two companies.
This solicitation is to plaintiff's customers who Andros dealt with. He sent it to gain their business for Voltarc. "In the absence of a covenant not to compete, an employee is entitled to solicit his former employer's customers immediately after terminating employment if the names of the customers do not constitute a trade secret." Town and Country House andHomes v. Evans, 314, 317-19, 189 A.2d 390 (1963). At the time, he had knowledge in his mind what plaintiff charged their customers. Among the customers e-mailed was Honeywell; the contact there that he had e-mailed was Rex. As a result of this solicitation, Rex contacted him and they arranged a visit of Andros to Honeywell in early April 2002. At the time of his visit, he was aware that Voltarc had submitted DU lamps for red label testing to Honeywell. After the e-mail to 50 of plaintiff's customers and return inquiries, he quoted prices to many of the recipients, including Honeywell. The prices that plaintiff had set as well as Honeywell's target prices to the plaintiff were in his mind and `part of the equation' of his decision of what price to offer these customers at Voltarc.
Since Andros has been at Voltarc he has dealt with Dr. Brian Cull his primary Honeywell contact as well at LCD Lighting. Cull and Rex are Honeywell's primary contact for both companies on the DU lamp.
While working at plaintiff, Andros was paid a base salary of $150,000.00 plus a discretionary bonus, as well as receiving certain fringe benefits, including a company car, country club membership, a CT Page 3655 phone and vacation time. At Voltarc, Andros' compensation is a base salary of $135,000.00 plus a bonus whose calculation is a percentage of the revenue of Voltarc's specialty fluorescent lamp, and similar fringe benefits. Voltarc has provided Andros the economic incentive to leave LCD Lighting. He competes directly with plaintiff. His income will increase if he beats out plaintiff in pricing to customers — the individuals he solicited in his March 9th e-mail. Andros has the motive to violate the confidentiality plaintiff is due in its pricing structure to its customers.[4]
The other defendant is Robert Cassidy. Cassidy was employed with the plaintiff from April 1996 until April 2002 when he resigned from plaintiff and went to work for Voltarc. He did not have a non-compete agreement with the plaintiff. The principals of Voltarc, Mehta and Laudano did not know Cassidy, until he was brought to their attention by Andros in mid-February 2002. As a result of that suggestion, Andros, Cassidy and Laudano met for dinner in the same month. Andros recommended Cassidy to Voltarc as an excellent engineer.
Voltarc made its offer to Cassidy in the first week of March, immediately after Andros had left the plaintiff. Cassidy gave Voltarc a counter proposal shortly thereafter. On March 28, 2002, Cassidy signed an employment contract with Voltarc. He then went back to the office at plaintiff's place of business and immediately reformatted his computer there so as to wipe everything off the hard drive. At the time he did that, Cassidy was aware that the plaintiff had inspected Andros' computer after he had left its employment. Cassidy wiped his hard drive clean because he did not want it analyzed by the plaintiff.
Cassidy is intimately familiar with the DU lamp manufacturing process. When he came to work with the plaintiff in April 1996, he immediately starting working on the plaintiff's compliance with Honeywell's luminescence requirements for the CDU and DU lamps. At that time, plaintiff was still in the latter stages of testing, attempting to meet Boeing and Honeywell specification requirements for the DU lamp. He was dealing directly with Honeywell, principally with Rex and Cull, visiting there three times while with the plaintiff. While at LCD Lighting he supervised the entire DU process development.
Cassidy's base income with the plaintiff was $97,000 with a discretionary bonus. His base income with Voltarc is $120,000 and he receives a bonus which is tied to sales in the specialty lamp division. His duties at Voltarc are substantially the same as his duties were with the plaintiff. When he negotiated his contract with Voltarc he wanted a bonus tied to either sales or productivity. When he negotiated his CT Page 3656 employment with Voltarc, Cassidy was aware that Voltarc was still trying to qualify as a supplier of DU lamps with Honeywell; he had seen their product when visiting Honeywell. He acknowledges that his knowledge of the DU manufacturing process was a likely reason for Voltarc's interest in him.
In order to determine whether the plaintiff's DU lamp manufacture process is a trade secret, the court must examine the following factors, "the extent to which the information is known outside the business and by employees and others involved in the business, the measures taken by the employer to guard the secrecy of the information, the information's value to the employer and to competitors, the resources the employer expends in developing the information, and the ease or difficulty with which the information could be properly acquired or duplicated by others." RobertS. Weiss Associates v. Wiederlight, 208 Conn. ___, 525, 538,546 A.2d 216 (1988).
The DU lamp market is very small; Honeywell is the only customer of plaintiff's, who is their exclusive supplier. From 1994 to the present, plaintiff sold 17,000 DU lamps to Honeywell. The development process from 1986 to 1996 was a major financial investment of plaintiff's. The development of the DU manufacture process was worked on by plaintiff over years in connection with Honeywell. Both corporations expended significant financial resources toward the lamp's development. Because Honeywell has sought a second source of supply, the interest of Voltarc in acquiring the knowledge of the plaintiffs manufacture process is high. This is a process that it has taken significant steps to safeguard. Computer access is restricted, with different levels of access based on a need to know and access codes. Development and manufacture process documents as well as pricing sheets are marked proprietary and confidential. Manufacturing employees of the DU lamp only have knowledge of their respective steps of production, not the whole process. Photographs are not allowed in the production plant. Honeywell, by agreement, will not divulge plaintiff's manufacturing processes to any other company or individual.
The question of whether, in a specific case, a party has made reasonable efforts to maintain the secrecy of a purported trade secret is by nature a highly fact-specific inquiry. Nationwide Mutual Ins. Co. v.Stenger, 695 F. Sup. 688, 691 (D.Conn. 1988). What may be adequate under the peculiar facts of one case might be considered inadequate under the facts of another. According to 35-51 (d) (2), the efforts need only be "reasonable under the circumstances . . ." (Emphasis added.)
Elm City Cheese Co. v. Frederico, 251 Conn. 50, 80, 75 2 A.2 1037 CT Page 3657 (1999).
The court finds that plaintiff has made reasonable efforts to keep secret both their pricing structure of lamps and their lamp manufacture process. The process of the manufacture of the DU lamp at LCD Lighting is kept confidential and proprietary to the plaintiff by restricting access to its plant and manufacturing specification. When Cassidy gave tours of LCD Lighting to customers, while he would walk them though the facility, he would not share specification of manufacture with them. All documents of specification of manufacture were labeled confidential and proprietary by LCD Lighting. The computer storage of manufacture process, customer date and pricing date was kept by LCD Lighting on a networks system, retrievable only by certain allowed users with password access. Both Andros and Cassidy qualified for that access while working there; they worked at the plant on computers supplied by LCD Lighting. Cassidy was given the use of laptop computers for portability while in plaintiff's employ.
In February 2002, Cassidy reported that his laptop had been damaged while at home and requested a new hard drive which LCD Lighting approved for him. Cassidy has consistently asserted that the hard drive on his laptop was damaged when his young child caused it to fall to the floor. The loss of the laptop hard drive on February 13, 2002 coincided with Cassidy's communications with Andros about his interest in Voltarc.
Upon joining Voltarc on April 1, 2002, Cassidy took over as head engineer of specialty lamps at Voltarc. The DU lamp is within the specialty lamp division of Voltarc. It is Cassidy's position that he has not divulged any trade secret information regarding the DU lamps because he asserts he learned nothing new about the process while he was at LCD Lighting and that all of his knowledge was acquired prior to working there; therefore, the manufacture process at LCD Lighting is not unique.
It remains, however, that the manufacture of the DU lamp by Voltarc did not receive Honeywell's approval for years. This is because, while the basic process of the manufacture of a serpentine florescent lamp is similar throughout the entire lighting industry, the actual approved manufacture process is a result of years of experimentation and adjustment to process to create a lamp that would conform to the strict tolerances specified by Honeywell and Boeing.
Neither of the defendant's expert witnesses, Shriver or Chang have ever attempted to make a DU lamp and certainly not one acceptable to Honeywell or Boeing. Their specialized knowledge is in the manufacture of serpentine florescent lamps for other purposes. Shriver's expertise is in CT Page 3658 the production of consumer lamps. While he is familiar with coat after bend technology for serpentine lamps for consumer end use, he had never seen a DU lamp. He acknowledged that the specification for a lamp with an end use in a cockpit may be very different. Further, he recognized as the industry that, based on his experiences at Phillips, when advances were made technologically, the developing company treated the information as both proprietary and confidential. Therefore when Cassidy came to LCD Lighting in April 1996, he only participated for a portion of one year in the development of these technological items for their initial production approval. Yet over the time of his employment at LCD Lighting he was privy to, supervised and gained knowledge of all of these lamp processes developments and the process of their continued improvement.
The DU lamp was first ready for production by LCD Lighting and purchase by Honeywell somewhere in the middle of 1996.
It should be noted that to be protected as a "trade secret" under Connecticut law, the information does not need to be "novel" to the same degree as is required to state an intellectual property claim under New York law. Thus, although the elements of an item may all be common and generally known, the combination of the individual components in a certain way may be a trade secret. See Allen Manufacturing Co. v. Loika,145 Conn. 509, 515-16, 144 A.2d 306 (1958) (holding that "the fact that every ingredient is known to the industry is not controlling for the secret may consist of the method of combining them which produces a product superior to that of competitors") (internal citation and quotation marks omitted).
Link Group Int'l v. Toymax, Inc., 2000 U.S.Dist. LEXIS 4567 @ 30, 54, n 7 (2000).
September 23, 1997, LCD Lighting and Honeywell entered into an Intellectual Property Agreement. The two companies had been working so closely together in "development of both tubular florescent lamp technology for avionics application" that they designed to clearly deprive what technology developments was owned by each company.
LCD Lighting uniquely developed technology, which it exclusively owned. It included twenty-one items. An examination of them confirms that while the technology of building a florescent lamp may be widely known, the technology processes for the DU (and its related lamps) lamp, to the specification of Honeywell, were uniquely developed at least twenty-one ways by LCD Lighting.
Items in Appendix 3 were these technologies that neither party claimed CT Page 3659 ownership over. The parties acknowledged that while coat after bending concept was not unique, (it was in Appendix 3) the plaintiff's coat after bend process and methodology of just how they applied it with drain tubes was unique.
Honeywell and LCD Lighting, in their agreement, agreed to non-disclosure to third parties of those items that were their respective uniquely developed technology. Further, they agreed that the technology had been developed over a 10 year period prior to 1997.
Voltarc and Cassidy have denied Cassidy's utilization of any information acquired at LCD Lighting in his work at Voltarc to produce the DU lamp. Instead he states he relies on information gained from a 1971 book on lamp design and lamp manufacturing and information gained from work at prior employment with Westinghouse and Phillips. Cassidy acknowledges he has the LCD Lighting manufacture process in his mind while he works on the DU lamp at Voltarc. He asserts he can draw on it as part of his current work because nothing in it is new to him, that all of this was in his mind before he joined LCD Lighting. He asserts he learned nothing in lighting at LCD Lighting from 1996 to 2002 to make him a better lighting engineer. The court does not find Cassidy credible in these assertions. The intellectual property agreement confirms that many aspects of the DU lamp manufacture process were developed uniquely by the plaintiff, some before Cassidy even arrived there as an employee.
Since Cassidy has been at Voltarc, he has worked in and supervised their DU lamp project. He claims to only have made changes there that he wanted to, but was not permitted to make while working at LCD Lighting. An employee of Voltarc, John S. Tulk, who is a phosphor coating engineer, has been with Voltarc since early 2000. Immediately on his employ at Voltarc he started working on the CDU lamp. In late 2000 to early 2001, he commenced work on the DU lamp. Ultimately, in June 2002, Cassidy placed him as supervisor of phosphor coating of the DU lamp. That project takes about 30% of his work time. Over the time line just described, Tulk acknowledged that Voltarc spent little time on the DU lamp until 2001, dropping it to focus on another project.
In late Spring 2001 Voltarc started to work somewhat on the DU lamp, largely under the supervision of Lou Winkler, a marketing manager. By the end of 2001, no Voltarc lamp had been approved for testing by Honeywell. The accelerated efforts at getting a DU lamp approved for testing came early in 2002, when Voltarc was courting Andros and Cassidy.
Cassidy placed Tulk in charge of the DU lamp coating but never told him the LCD lamp coating process. Tulk then testified that he, Tulk, CT Page 3660 unilaterally made changes to the coating process with no prior input or approval from Cassidy. The court does not find credible that there was no conversation by Cassidy with Tulk on the phosphor coating, and, no approval by Cassidy of the coating changes in June and July 2002. All such changes required the approval of Honeywell. It is preposterous to imagine that Voltarc's engineer in charge of the DU project would not have prior knowledge or approval of a substantive manufacture process change that required Honeywell's review and approval. Thereafter, Sastri recalls that it was Cassidy, not Tulk, who implemented the coating change in the lamp. The court finds Sastri credible in his testimony.
There are various steps to the manufacture of a DU lamp. Cassidy has recommended modifications to every major stage since he has arrived at Voltarc in April 2002. He continues to reverse the process at Voltarc.
Cassidy believes that nothing is confidential or proprietary of either plaintiff's or Voltarc's work. Therefore, he has felt and will feel free to pass on information regarding LCD Lighting's process of manufacturing the DU lamp. Furthermore, the court specifically finds that Cassidy is inclined to the provision of manipulative, misleading and untruthful information in the commenced marketplace when it suits his interests.
An example of this regards his recommendation on how to deal with an impending visit to Voltarc by representatives of Honeywell, for purposes of examining these DU manufacturing process. Voltarc's meter for testing DU lamps was overdue for calibration from October 8, 2001. Therefore, as Honeywell representatives were to visit Voltarc in early August 2002, Cassidy recommended to Voltarc as follows: "As for the visit the meter should be in a box awaiting shipment or in transit. We can tell Honeywell that the meter was scheduled for calibration August 1st and is being or has just been sent for calibration." The court finds on matter of credibility that Cassidy is not to be believed.
As to the changes Cassidy has made since he has been at Voltarc, he asserts he has placed none of these specifications in writing. They are all oral notwithstanding that he knows that they must be submitted in writing for approval to Honeywell.
One change that he has made is the phosphor coating.
Prior to June 2002 Voltarc's development of the DU lamp had a single mix presentation. That is, as a matter of the technology the AlonC was premixed into the phosphor coating.
The phosphor coating is in its application, thickness, phosphor CT Page 3661 adhesion, uniformity and other factors essential to the acceptability of the DU lamp. That is, all florescent lamps have a coating. The coating's mixture, application timing of application before or after binding the glass, coating and drying and adhesion techniques all contribute to a lamp that will burn with the required brightness, evenness, intensity and longevity (as well as other factors) measure by Honeywell. That combination is a part of the trade secret of the manufacture process that the plaintiff asserts.
Cassidy changed Voltarc from a single mix application after June 2002 to a separate coat application of the Aluminum Oxide. While this is not unique to plaintiff, the way plaintiff accomplished it is unique. Because the specifics of how Cassidy is accomplishing this is not in writing, it cannot be scrutinized for comparison to the plaintiff's process.
The progress of Voltarc's development of the DU lamp has been well scrutinized. After not participating for long when Honeywell looked for manufactures of the DU lamp originally, Voltarc recommenced conversations with Honeywell in 1999 to become a second source supplier of the lamp. The original goal was to be a supplier by the end of 2001. That was not met. When Cassidy came to Voltarc in April 2002 he was put in charge of the engineering development of the DU lamp instead of Sastri. On March 11, 2002, the first red labeled lamps were shipped to Honeywell for testing. These passed many, but not all Honeywell's tolerance tests. The red label testing took about four months to July 2002 as of the commencement of this trial. Cassidy was interfacing with Honeywell's engineer Cull to get the Voltarc DU lamp in shape to pass. The changes Cassidy has made have been to enable the lamp to pass red label testing. The lamps from March 2002 that were not approved in June 2002 by Honeywell failed in a key test: luminescence uniformity. This test is an essential matter for Honeywell. Voltarc's coating tested 20% worse as compared to plaintiff's. The change in the coat after bend process by Voltarc, at Cassidy's direction — not Tulk's addresses this. Cassidy has the benefit of the knowledge of all the tests that LCD Lighting accomplished to be successful in this area, as evidenced in all experiments in the "Big Book" exhibit.
The other modification Cull demanded of Voltarc was regarding the chromaticity point of the lamps. This is the point of color change. A review of the Big Book discloses that LCD Lighting performed experiments to achieve optimal chromaticity in its DU lamps.
In response to Honeywell's request, Cassidy recommended a modification in the Voltarc procedure to improve the chromaticity tolerances. CT Page 3662
As of July 18, 2002, Cull explained, these modified lamps have not been red label tested at Honeywell. Subsequent to Cassidy's changes in the DU manufacture process, Voltarc once again shipped lamps to Honeywell for testing. These lamps were shipped on July 16, 2002. This time, the lamps passed many more of Honeywell's tests, but remained deficient regarding a color change Honeywell required. Subsequent to this, by the conclusion of the evidence in this matter in September 2002, Voltarc's DU lamp was approved by Honeywell for production.
Voltarc is the plaintiff's direct competitor in the specialty lamp market. While Voltarc and other lamp competitors successfully manufacture serpentine florescent lamps, LCD lighting remains the sole successful manufacture of the DU lamp.
The specific combination of these methods, their sequences, the style, manner in which they are accomplished is unique to plaintiff. While other companies are aware of the coat after bend technology, the glass cutting, the use of drain holes to apply AlonC, the use of pumping and exhausting station (and the software for the pumping station) to place the gas in the tubes, and the baking and lehring process, butt sealing of the lamp and its ruggadized filament[5] these processes as applied by plaintiff create the only uniformly and repeatedly acceptable lamp for the market's use in the Boeing 777 cockpit backlighting. Plaintiff has expended millions of dollars developing this process. There is clear economic value to plaintiff in this market. Having sold 17,000 DU lamps to Honeywell at an average price of $600 per lamp, plaintiff has gross receipts from this product, from 1994 to the present of $10,200,000.00.
Considering all of these factors, the court finds that the plaintiff's manufacture process of the DU lamp is a trade secret, from which the defendant Voltarc can gain.[6]
Based on the evidence presented, the inconsistencies in Cassidy's testimony, and his lack of credibility, the court finds he has and is likely to continue to divulge to Voltarc the plaintiff's manufacturing process of the DU lamp which is a trade secret. This is a violation of the Uniform Trade Secret Act.
The plaintiff urges the court to also find that its customer lists and pricing structure in its avionics lamp division are trade secrets, as well. It is no secret that Honeywell is the plaintiff's sole customer for the DU lamp; that is information not entitled to protection. The court finds the pricing structure constituted trade secrets. Insufficient existence of customer lists was before the court to determine that they constitute trade secrets. CT Page 3663
Andros who supervised all sales and marketing at LCD Lighting had an active role in all of plaintiff's avionics sales, both in cultivating customers and, his intimate knowledge of the pricing of products sold to them. He was also knowledgeable of the target prices Honeywell set for the DU lamp, that it desired to purchase at. He also took with him to Voltarc information on contact people in consumer's offices. He utilized this information immediately. He also has priced competitively for Voltarc with LCD Lighting's pricing in mind. Therefore, when he went over to Voltarc he had in his mind the competitive advantage of knowing what Honeywell wanted to pay for the lamp, and, what LCD Lighting was charging Honeywell for the lamp.
This in itself is an unfair advantage to Voltarc. These prices were secret and Andros only had access to them because of his employment. No one else at Voltarc had the means to process this pricing information. It was access code protected at LCD Lighting. Andros' behavior constitutes a misappropriation of trade secrets.
 THE REMEDY
Voltarc had accomplished much of the DU lamp manufacture process development before Cassidy arrived. While those red label lamps did not pass all of Honeywell's tests they had passed many of them and were in what Cull characterized as the post qualification testing phase.
Further, Honeywell's interest in a second source manufacturer affects the public interest. The DU bulbs are necessary for backlighting. The control panel of Boeing's 777 aircraft which is a major commercial aircraft in the national and international arena. Honeywell's interest in a second supplier of the DU lamp is not just for assurance of supply; they have had pricing disputes with LCD Lighting. Principals of the marketplace suggest that competition helps to regulate price.
Plaintiff seeks an injunction to remedy defendant's misappropriation of trade secrets. The Uniform Trade Secrets Act provides the discretion of the court in issuance of an injunction without requiring proof of irreparable harm to the plaintiff. Where the statutory remedy is the imposition of an injunction, such proof is not necessary. "The rationale underlying [the] rule that the complainant is relieved of his burden of proving irreparable harm and no adequate remedy at law is that the enactment of the statute by implication assumes that no adequate alternate remedy exists and that the injury was irreparable, that is, the legislation was needed or else it would not have been enacted."Conservation Commission v. Price, 193 Conn. 414, 429, 479 A.2d 187
CT Page 3664 (1984).[7]
Plaintiff argues that an injunction is necessary since both Andros and Cassidy have, and inevitably will continue to disclose their trade secret knowledge. While the court concurs that their disclosure, more probably than not have occurred and are likely to occur again, it does not inevitably follow that an injunction is the most appropriate remedy.
The injunctive relief plaintiff seeks is to enjoin Andros for working at Voltarc for a period of time and to preclude Voltarc from selling DU lamps to Honeywell for a period of time.
The court must consider and balance the equities. LCD Lighting has invested ten years working with Honeywell of which four years were exclusively directed to the DU lamp and millions of dollars in the development of the DU lamp. Voltarc has invested approximately one and a half years developing the DU lamp. Of that time, in the first year a lamp was developed that had some indicia of future success before Cassidy arrived. Cassidy arrived and five and half months later the lamp was approved.
Meanwhile, Andros has been utilizing his knowledge of plaintiff's customers in avionics and pricing schedule since his arrival at Voltarc. The benefit to Voltarc has not been placed in evidence since plaintiff did not offer evidence of its economic damages.
In light of the above, the court, balancing the equities, issues the following orders as to the Unfair Trade Secret Act claims for misappropriation of the trade secrets of the manufacture process for the DU lamp: an injunction shall issue against Voltarc, Inc. as follows: Voltarc, Inc. shall not sell any DU lamps until September 21, 2005, said injunction intended to be for a period of 2 1/2 years from the issuance of this decision. The claims for money damages pursuant to the plaintif's complaint will be tried next, as stated on the record by counsel previously. At that hearing, the plaintiff shall have the burden of proof as to an appropriate amount to be set for damages pursuant to C.G.S. § 35-53.
Cassidy is enjoined from any further disclosure of the LDC Lighting DU lamp manufacture process to any individual or entity.
As to Andros, use of the trade secrets of LCD Lighting for the pricing of other products in the lighting industry, a comprehensive equitable remedy would be likely ineffective. He has been employed by Voltarc for one year now. Customers have likely made their decisions as to whether to CT Page 3665 switch to Voltarc based on any advantageous prices he has offered them knowing what they previously paid to LCD Lighting for the product.
On the other hand, the court notes that Andros' own records disclose that pricing and production capacity information of use to a competitor often spans more than one year. At the same time, plaintiff has failed to provide the court with sufficient evidence that injunctive relief can positively remedy the plaintiff's dilemma. Therefore, the court concludes that money damages is the better remedy in this instance. C.G.S. §35-53 (a). No injunction shall issue as to Andros.
Munro, J.